## OTTIE E. TROSPER V. STATE OF NEBRASKA.

FILED DECEMBER 31, 1934.   No. 29212.

*O. E. Bozarth, C. E. Clark* and *C. D. Ritchie,* for plaintiff in error.

*Paul F. Good, Attorney General,* and *Daniel Stubbs, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and MUNDAY, District Judge.

DAY, J.

The plaintiff in error, hereinafter referred to as defendant, prosecutes error proceedings to this court from a conviction for violation of section 28-453, Comp. St. 1929. The statute provides: "Whoever, either verbally or by written or printed communication, either by himself or by an agent, maliciously threatens to accuse another of a crime or offense, or to do any injury to the person or property of another, with intent to extort money or pecuniary advantage whatever, either for his benefit or for the benefit of another, or to compel the person so threatened to do any act against his will, shall be deemed guilty of blackmail and shall be imprisoned in the penitentiary not more than three years nor less than one year, or be fined not less than two hundred dollars nor more than five hundred dollars."

The crime of which the defendant was convicted was

charged as follows: "That Ottie E. Trosper, on or about the 25th day of November, 1933, in Frontier county, Nebraska, then and there being, did, then and there unlawfully and feloniously, directly and verbally by himself, maliciously threaten to do an injury, to wit, cut and castrate and kill one Charles H. Compton, with intent then and there to compel said Charles H. Compton, who was then and there the person so threatened to do an act, to wit, to convey real estate to said Ottie E. Trosper, against the will of said Charles H. Compton."

The defendant contends that the information is fatally defective for that it does not state that the threat was made to the person threatened; and that there is no allegation as to the ownership of the property demanded. *State v. Goldenberg,* 211 Ia. 234, cited to the first proposition, is not decisive because the complaints are not similar. In that case, it was charged that one "did maliciously threaten another with intent to extort money." The information in the instant case charges that defendant threatened Compton to compel Compton to convey real estate to him. We think the defendant's contention is untenable. Other cases cited are concerned with different statutes in other states. The rule in this jurisdiction is: "When an information alleges all the facts or elements necessary to constitute the offense described in the statute and intended to be punished, it is sufficient." *McKenzie v. State,* 113 Neb. 576. See, also, *Sandlovich v. State,* 104 Neb. 169; *Goff v. State,* 89 Neb. 287; *Cordson v. State,* 77 Neb. 416. The information in this case sufficiently charges a crime, the elements of which are defined by the statute. The criticism of the information is highly technical. Nobody was misled by it or misunderstood the charge made against the defendant. The technical rules of the common law are relaxed in this state. *Nichols v. State,* 109 Neb. 335. To hold this information insufficient would be to recede from our advanced position in the *Nichols* case and restore in part at least the old, cumbersome and involved form of information which served no

useful purpose in the administration of justice. We are not willing to do this.

The defendant also insists that the evidence is not sufficient to sustain the verdict. The crime of blackmail as defined by the statute, which is quoted above, required that the state prove beyond a reasonable doubt that defendant Trosper made a malicious threat to do an injury to Compton to compel him to do an act against his will. This challenges our attention to the somewhat sordid details of the evidence. Compton on the day in question called at the Trosper home to leave their mail which he had brought from the mail box some distance away when he got his own mail. Trosper who saw him coming hid in the bedroom of their two-room house. In response to Compton's knock, Mrs. Trosper invited him to "come in." According to Trosper, he came in the house, asked how "she was," and "she said, 'all right.'" And "he asked her how I was, and how Elvin was, and she said, 'all right.' And he said a few words about the wind blowing so hard; and I believe he handed her a paper when he first came in; and then took the paper and said he guessed he would be going."

As Compton was going out the door, Trosper came out of the bedroom and then followed the events which are the basis of this prosecution. There is some dispute as to details, but in general the picture is the same. The defendant accused Compton of making too many stops at his house. The two families had been close neighbors and upon the most intimate terms. Compton denied the accusation, whereupon Trosper hit him several times, until he knocked him down upon the cement floor of the porch. Let the testimony of Trosper continue this narrative:

"Q. What else was said, if anything? A. I said, 'Get up then and come on;' and he got up and we went outside and went down toward the garage, or down where the car was, to a bank shed below this south hill; a cement building on three sides, with a frame roof; and on the west end I had,—when I first built it I made it for a chicken house,

and there were,—on the west part there was a partition of twenty-four feet east, that partitioned off twenty-four feet off the west end, that I expected to use for a chicken house; and on the south side it was partitioned off to the level of the plate, and below that there were canvases, I believe, that I put up there, and some chicken wire and boards up some ways from the bottom, to kind of enclose the south side of it; and I started around to this chicken house when we came down the hill, and he sauntered off toward the car, and I said, 'Come on over here.' * * * Q. Now, what next took place then, Mr. Trosper? A. Well, we went over to the door then of this building, of the west part; the door is in the southeast corner of this twenty-four feet partitioned off from the building, and I opened the door; it was just a little door there that I fixed to hold the chickens in when I fixed it, and he said, 'What do you want me in here for?' and I said, 'I didn't say;' and he backed; and there was a post sitting next to this door and he backed up to that and grabbed hold of that, and I said, 'Come on, we are going in here;' and he said, 'I am not going in there;' and he backed up to this post and grabbed that, and he shoved his right hand in his pocket, and as he shoved his right hand in his pocket, I grabbed his hand with my left one and hit him a few, and then told him to take his hand out, and he did; and he broke loose and ran to his car, and I caught him at his car door, and I said, 'Come on, you son of a bitch, you are going in there;' and when we got to the car I took hold of his elbow; and he grabbed hold of the back of the car, and in the scuffle he took hold of me and I got him down again, and, I don't know, hit him a time or two, and asked him if he was coming, and he said, 'Yes,' and then we walked in there."

After Trosper had Compton in the shed where he could not get away and practically helpless from the severe beating given him, with his face and ears all bloody, more conversation took place. Among other things, defendant told Compton that he would put his brains out with a stick

he had, unless he put a knife in his pocket; that he ought to be "cut" and that if he came to his house any more, "I will cut you." Trosper testified, "I asked what he was going to do about it, and he said he didn't know; he said, 'What do you want?' and I says, 'What are you willing to pay for it?' I said, 'The damage?' and he said, 'Well, what do you want?' and I said, 'There is just one of two things, you can deed me a hundred and twenty acres of land, or I will sue you; one of the two.' " Trosper further testified: "He said, 'How much money will you take?' and I said, 'I do not want your money;' and he says, 'How would a hundred acres of land do?' and I said, 'I didn't say a hundred acres; I said a hundred and twenty, or none;' and then he said, he agreed * * * well, that we would go to town and fix it up; and I asked him if there was any mortgage on it, and he said, 'No;' and I asked him if he could give a clear title, and he said, 'Yes;' and I asked him where the deed was, and he said 'In the First National Bank.' "

Then Trosper took Compton from the shed to the house and proceeded to have him carry out the promise to deed the land to him. We have quoted much of the testimony of Trosper, because it alone seems to us sufficient to support the verdict. The evidence for the state, however, is that the defendant threatened to "cut him" and to kill him, unless he deeded the land. The evidence in the record, even that of defendant himself, forces the conclusion that it was his intent to compel Compton to act, by malicious threats.

However, the defendant contends that, after the shed episode, he accompanied Compton to his home, where he went into the house, from which time he was not under the domination of defendant and did not act against his will thereafter. Of course, when Compton, his wife, and defendant went to Cambridge for the purpose, as defendant thought, to deed the land, they did not do it. It was not essential to sustain the charge that they should do so. If a crime had been committed, it was completed before the parties reached the Compton home.

In *State v. McGee,* 80 Conn. 614, the court held: "The gist of the offense created by the statute is the threatening * * * with the purpose or intent to intimidate, and it is not necessary, to constitute the crime, that the person who is threatened shall in fact be intimidated, provided the threats are such as are calculated to intimidate or put in fear an ordinary firm and prudent man."

In *Commonwealth v. Corcoran,* 252 Mass. 465, the court held: "The gist of the offense described in the statute is the attempt to extort money. * * * If the threat be of the kind referred to in the statute, and is made with the intent thereby to extort money, or with the intent to accomplish any of the other objects mentioned therein, the crime has been committed. The language is explicit and is not subject to any exceptions or qualifications. The legislature did not make the commission of the offense dependent upon the state of mind of the person threatened, and there is no occasion for reading into the statute qualifications not there found."

In *People v. Robinson,* 130 Cal. App. 664, the court held: "It is well settled that the crime here charged depends upon the conduct and intent of the person who makes the threat, and that the effect produced upon the person against whom it is made is immaterial, so that if the effect in evidence warranted the jury in believing that the defendant intended that his threat would produce 'fear' in the mind of Showalter, and if the threat was of such character as might reasonably have that result, it would be wholly immaterial that Showalter was unaffected thereby. *People v. Lavine,* 115 Cal. App. 289."

Following these authorities, we hold that the gist of the offense of blackmail created by the statute is the malicious threatening to do injury to the person of another, or to accuse one of a crime or offense, to compel him to do an act against his will.

The trial court, says the defendant, erred in excluding evidence offered by him of the truth of the charge made that the complaining witness had debauched and carnally

known his wife. In the first place, the defendant did not upon the occasion make any such charge, unless inferentially by language such as heretofore quoted. He does not come within the rule that he was making an honest effort to collect a just debt. The facts do not bring this case within the authorities cited. Moreover, conceding, which is more than generous, that the testimony of defendant could support a finding that such was the fact, the verdict of the jury has decided differently upon a disputed question of fact. If the defendant only made a threat to accuse Compton of misconduct with his wife, the truth of the charge is immaterial.

In *State v. Needham*, 147 Tenn. 50, the court said: "Under the weight of authority it is immaterial whether the person against whom the threat is directed is guilty or innocent of the crime of which he is threatened to be accused." See *McKenzie v. State*, 113 Neb. 576; *Commonwealth v. Bernstine*, 308 Pa. St. 394; *Id*. 103 Pa. Super. Ct. 518; *State v. McDonald*, 192 Wis. 612; *State v. Adams and Belascio*, 7 Boyce (Del.) 335; *State v. Richards*, 97 Wash. 587; *State v. Kramer*, 31 Del. 454; *State v. McGee*, 80 Conn. 614.

Therefore, we conclude that, in a prosecution under the statute (Comp. St. 1929, sec. 28-453) for blackmail, it is immaterial whether the person against whom the malicious threat to accuse of a crime or offense to compel him to do an act against his will is guilty or innocent of the charge.

But the threat to accuse of a crime was not all that was done in this case (if the language used is such an accusation), but it was accompanied by violent physical force and further threats of violence and great bodily injury. The story lacks a certain appeal to reason in that the families of the defendant and Compton had been on friendly relations for years and were frequently together several times a week up to the date of the trouble. The defendant testified that for more than two weeks he had suspected that Compton was calling at his home too much;

but, instead of discouraging the intimacy, the record indicates he encouraged it. On the day in question, the evidence is undisputed that Compton was not guilty even of an indiscretion, unless it was calling at defendant's house on a neighborly errand. The record is that Compton did not make improper advances toward Mrs. Trosper at that time.

Much was said in argument about the conversation with Mrs. Compton when Trosper took Compton home after the altercation. It was tortured into an admission of the truth of the charge by Compton in this manner. It was said that Mrs. Compton asked her husband if it was true, and he said, "No." Then she said, "Look me in the eye," which he did, whereupon she agreed to sign the deed to the land. Again we turn to the testimony of defendant: "She said, 'Charlie, is that so?' and he said, 'No, sir; it is not;' and she said, 'Turn around here, Charlie, and look me in the eye;' and he turned around and she looked him in the eye, and she said, 'Well, I cannot believe that; I cannot believe it; it is nothing but a blackmail.'"

Since the truth of the charge made against Compton was immaterial, it was not error for the trial judge to exclude the offer of testimony of the defendant's wife that she had engaged in sexual intercourse with Compton several times prior to the fateful day. The record discloses that Mrs. Trosper was not only a willing but a ready witness and answered the question relative thereto before an objection could be interposed. It was stricken out by the court.

Several assignments relate to the giving and the refusal to give certain instructions. Some of the objections relate to questions already decided in this opinion. We have carefully examined all complaints to instructions and find no prejudicial reversible error in this regard. The instructions of the court covered the issues, protected the legal rights of the defendant, and correctly submitted the issues. This case was not so difficult as to justify an opinion of this length, but we have given careful and

painstaking consideration to many assignments of error, because able and energetic counsel have presented them so thoroughly and well. The important feature of this case was the evidence, and the jury resolved it against the defendant, which is final, since there is no reversible error apparent in the record.

AFFIRMED.