## UNITED STATES v. PIGNATELLI.

### No. 155.

Circuit Court of Appeals, Second Circuit.

Feb. 13, 1942.

Joseph Brill, of New York City (Joseph Brill and Jerome F. P. Tobin, both of New York City, of counsel), for appellant.

Mathias F. Correa, U. S. Atty., of New York City (Raymond Ickes, Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendant, Ludovic Pignatelli, was separately indicted for violating Section 338a(c) of Title 18 of the United States Code Annotated and also for conspiring with Theodore Bolduc and William M. Gibson to violate Section 338a(c) thereof. Having been convicted under each indictment he has appealed. We think that each conviction should be affirmed.

Section 338a(c) reads as follows: "(c) Whoever, with intent to extort from any person any money or other thing of value, shall knowingly deposit or cause to be deposited in any post office or station thereof, or in any authorized depository for mail matter, to be sent or delivered by the Post Office Establishment of the United States, or shall knowingly cause to be delivered by the Post Office Establishment of the United States according to the direction thereon, any written or printed letter or other

communication, with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to injure the property or reputation of the addressee or of another, or the reputation of a deceased person, or any threat to accuse the addressee or any other person of a crime shall be fined not more than $500, or imprisoned not more than two years, or both."

The indictment under Section 338a(c) charged Ludovic Pignatelli with having mailed in the Southern District of New York a certain letter and written communication addressed to the Princess Rospigliosi, Newport, Rhode Island, containing a threat to injure the reputation of Guido Pignatelli and Henrietta Pignatelli.

The indictment under Section 88 charged Ludovic Pignatelli, Theodore Bolduc alias Leon DeVar, and William M. Gibson with conspiring to deposit in the Post Office certain letters and communications containing threats to injure the reputations of the addressees and others, in violation of Section 338a(c).

Ludovic Pignatelli, hereafter spoken of as "Ludovic," came to the United States some time prior to 1915. In 1934 he was granted a patent for a clay target which he had invented for shooting clay pigeons and sought to place it on the market, but with little success. In 1940 he attempted to organize a shooting club but never got beyond the incorporation stage because, as he testified, Guido Pignatelli, a distant relative, who had married a wealthy widow named Henrietta Hartford, and was calling himself Prince Pignatelli, impaired Ludovic's standing and deflected his customers. Ludovic claimed to be the only Pignatelli entitled to the name of Prince and testified that Guido's false assumption of the title caused him to lose a contract for the manufacture of his target and to fail in his effort to launch the enterprise of the shooting club.

In June 1940, Ludovic brought an action in the New York Supreme Court against Guido and Henrietta to enjoin them from calling themselves Prince and Princess Pignatelli. In his complaint he alleged that they were not lawfully married, were unlawfully assuming the names of Prince and Princess Pignatelli and were interfering with his business and his exclusive right to the title. During the year 1940 Ludovic was writing an autobiography containing a chapter entitled: "Fakers' Titles in the U. S. A.," listing Guido and Henrietta among the fakers.

On August 23, 1940, Ludovic wrote a letter soliciting an interview to the Princess Laura Rospigliosi, hereafter called Laura. She was an old acquaintance and granted the interview. He told her of his lawsuit and that he wanted to get large sums of money out of Guido and Henrietta. She agreed to try to adjust matters with them. According to her testimony she afterwards received by mail a letter from Ludovic dated August 30, together with a written statement of his terms of settlement which were in the following form:

"1. Will discontinue all court actions or proceedings.

"2. Will file legal papers in the office of the Spanish Counsel General to recognize Guido as Prince, as I have no male heir; and file copies of papers filed in the Spanish Counsel General's Office with the Italian Counsel General so there will be a record in the Italian Counsel General's Office of the papers on file in the Spanish Counsel General's Office.

"3. Will omit from autobiography or biography any reference to Guido or his family. This book is now in the hands of the publisher.

"4. Will assign one-half interest of all my claims to properties in Spain.

"5. Will give Guido one-half of the Preferred Stock in the corporation which is own and operate a target-shooting club.

"6. Will have Guido elected Vice-President of the Sporting Association of which I am President so that everybody will know that we are at peace."

"1. Guido will give to corporation to be organized to own and operate target-shooting club, certified check or cash in the amount of $200,000.00.

"2. Certified check or cash for $300,-000.00 made payable to me or person designated by me to receive same in payment for assignment of one-half interest of my claims to properties in Spain.

"3. When agreement is reduced to writing it must provide that a cash payment of $10,000.00 be made and the remainder of money or checks to be held in escrow until all necessary papers have been filed. This $10,000.00 will have to be expended by me in filing papers and it will be deducted from item of $300,000.00 referred to above."

Ludovic testified that he had handed the terms of settlement to Laura at Providence on September 5, and that the letter of August 30 contained other papers. She testified that she received in Newport an envelope postmarked New York containing both the letter of August 30, 1940, and the terms. This testimony was confirmed by the witness Isabelle Meuser. The divergence in the testimony between Ludovic and the other two witnesses was pointed out to the jury and its verdict established the factum of mailing the terms in favor of the government.

When Ludovic called on Laura prior to the mailing of the letter of August 30, 1940, he asked her to arrange that he should get $400,000 from Guido, $200,000 for the title, and $200,000 for investment in the shooting corporation. In this connection he had offered to pay her a commission of $25,000 (which she said she rejected) if the deal went through. She asked him what would happen if he didn't make any such adjustment, to which he replied: "Then I will really have to take it and fight it, and I will have to publish a lot of things in this book, and I will have to do this; I mean, start suits all over the place which cause a lot of notoriety which will be unpleasant to everyone." This was followed by the letter of August 30, 1940, and the accompanying proposal which raised the amount of his demands from $400,000 to $500,000.

An interview between Ludovic and Guido in Providence resulted in the rejection of the proposal. At this meeting Ludovic had Laura repeat them to Guido.

On September 7, 1940, after the adjustment fell through, the defendant Gibson wrote to Laurence A. Coleman, one of Henrietta's attorneys, enclosing a copy of a letter from Ludovic saying: "I have decided on account of certain circumstances to go ahead with the entire parts of my book and not to take off a certain part of the chapter on 'Fakers Titles in U. S. A.' but on the contrary I will add something to it as I want all the truth about some people I know. So kindly go ahead and I will send you in a few days what must be added to on the Fakers Story. It is going to be good, but not to be good for some other to be shown up for what they are. * * *"

Gibson had already written Henrietta on July 31, 1940, telling her that he had a manuscript presented for publication dealing with Guido and her family and saying that the story would "be very injurious to all of you and to the A. & P. business." On August 2, 1940, he again wrote her saying he thought that he and her attorney could "quiet this matter in some way," and offering to sell her a Van Dyck portrait for $150,000 at a "sacrifice," though he appears to have been able to purchase it from the owner for $12,000. On August 11, 1940, he wrote to her attorney Phelan, offering the portrait and asking him to tell Henrietta that he had "returned the manuscript to the writer and he has taken it to another publisher and no doubt it will be published," and adding: "It seems to me that the only way to settle that matter is for her husband to be adopted by the Prince who has the legitimate title and he can transfer the title to Guido and it would be legitimate. He has photostat copies of the marriage certificate, license for the motor car and etc. I am afraid that another story will be in the papers very soon." The statement as to the marriage certificate referred to Ludovic's claim that Guido's divorce from his first wife, obtained at Reno before he married Henrietta, was invalid in New York, because that place, and not Reno, was his residence at the time of the divorce, and hence the marriage to Henrietta was not lawful. The reference to the motor license was based upon the claim that in obtaining it, Henrietta had sworn that she was a resident of New York, whereas her residence was Newport and she only lived in New York temporarily.

Gibson had read the manuscript submitted to his firm for publication and was in frequent communication with Ludovic. His suggestion that Guido be adopted by Ludovic in order to obtain the title of Prince, his offers to aid Guido and Henrietta, and his dealings with the manuscript and his letters about its publication, all showed cooperation in the blackmailing scheme. He was convicted both under the conspiracy indictment and under another indictment for violating Section 338a(c) and took no appeal.

The defendant Bolduc, alias DeVar, was a fugitive from justice at the time of the trial. Accordingly a severance was granted. But there was evidence admissible against Ludovic and Gibson that he participated in the conspiracy. On March 28, 1940, two months before the New York suit was brought he wrote a note to Guido.

and Henrietta advising them that they would be sued, that they should have their attorney get in touch with him as he knew the whole incident and it could be fixed. He followed this letter by another to Henrietta dated April 1, saying that papers "will be served on you and your husband for assuming titles to which Prince Ludovic Pignatelli claims he has sole right. Should you be embarrassed in any way, by the legal suit, just call me and I'll let you know an easy way to make Prince Ludovic drop the proceedings."

The proprietor of the Hotel Sharon in New York testified that he had frequently seen Ludovic at the hotel calling on DeVar and had been told by the latter that a civil suit was in progress between Ludovic and a cousin of his. It is improbable that De-Var should have intimate knowledge of the details of the dispute between Ludovic and Guido and of Ludovic's plans to establish his rights through litigation and should be offering to aid in a settlement unless there was an understanding between Ludovic, Gibson and himself and a participation in the enterprise and the profits expected from it.

 Upon the evidence we have sketched there was enough to justify the verdict of conviction of Ludovic under both indictments.

. The appellant, however, says there should be a reversal and new trial because the court excluded his offers to show that he had the sole right to the title of Prince. He argues that such evidence was relevant as bearing on whether his proposals were made in good faith and only in order to adjust pending disputes. But the letter of August 30 and the proposals accompanying it involved far more than the settlement of the suit. The book describing the victims as "Fakers," i. e., swindlers, and parading their alleged irregular marriage was a threat to injure their reputation, pure and simple. It is true that Ludovic was free to publish the facts at the risk of liability in a libel suit, but he was not free to threaten to injure their reputations and to use the mails for that purpose in order to settle his claim. Threats to damage another's reputation are no proper means for determining a controversy. It may be adjusted either by suit or by compromise but settlement must not be effected by using defamation as a club. The threat to publish the book for such a purpose was unlawful and it made no dif-

ference whether Ludovic had the sole right to be called Prince or not. Consequently the evidence that he had a superior title was properly excluded. Moreover, whether Ludovic's title was superior or not when he was proposing to get $500,000 out of Guido and Henrietta he could not have supposed that he was merely settling a valid claim as to the use of the name Prince. On the contrary, he was evidently bent on extorting huge sums of money from his victims in exchange for the cessation of threats to defame them. The book on heraldry dealing with Italian titles which was admitted for the purposes of showing the basis of the negotiations for settlement was far from conclusive on the subject of Ludovic's sole right to call himself Prince Pignatelli. According to the testimony, Guido and his father had been called Prince both in Italy and America. The value of the title was manifestly of inconspicuous importance and without substantial pecuniary value. It could have no value except in a foolish and frivolous society in which both Pignatellis aspired to move. To persecute people with threats and litigations, under the circumstances disclosed, for the purpose of extorting money from them was something which the blackmail statute was designed to remedy.

All the decisions we have been able to find bearing upon the relevancy of Ludovic's title to the issues justify the rulings of the trial judge. State v. McKenzie, 1931, 182 Minn. 513, 235 N.W. 274; Trosper v. State, 1934, 128 Neb. 165, 258 N.W. 62, 63; State v. Phillips, Idaho, 1941, 115 P.2d 419; People v. Beggs, 178 Cal. 79, 172 P. 152. The appellant relies on People v. Griffin, 2 Barb. 427, an old decision in which the New York General Term reversed a conviction under a statute prohibiting sending letters "with * * * intent to extort or gain property * * * belonging to another." The defendant in that case had threatened to burn property unless an indebtedness to him, which was actually owing, was paid within a certain time. The court said that under the statute: "The end, as well as the means employed to obtain it, must be wrongful and unlawful." It treated the words "belonging to another" as not embracing threats unless the title to the money sought to be extracted was not in the claimant. The construction of the New York Act was highly strict and technical and its terms were more limited than the general words "threat to injure the property or

reputation of the addressee or of another" appearing in Section 338a(c). Furthermore we believe that People v. Griffin no longer represents the view of the New York courts, at least when applied to a statute like the one before us. In interpreting a New York statute declaring it a crime to threaten a person with a criminal prosecution for the purpose of extorting money the General Term of the New York Supreme Court said in People v. Eichler, 75 Hun 26, 26 N.Y.S. 998, 999: "The fact that the person who in writing or orally makes such a threat for such a purpose believes, or even knows, that the person threatened has committed the crime of which he is threatened to be accused, does not make the act less criminal."

Judgment affirmed.