UNITED STATES of America,

v.

George ZAPPOLA and Robert Melli, Defendants.

No. SS79 Cr. 142–CSH.

United States District Court,
S. D. New York.

Sept. 29, 1981.

Thomas Fitzpatrick, Asst. U. S. Atty., New York City, for the United States.

La Rossa, Brownstein & Mitchell, New York City, for defendant Zappola; Paul B. Bergman, New York City, of counsel.

Ronald P. Fischetti, New York City, for defendant Melli.

MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The Court decides in this opinion an issue concerning the proper jury charge to give, in a case where the Government accuses the defendants of attempted extortion under the Hobbs Act, 18 U.S.C. § 1951. The Act reads in pertinent part:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

\*  \*  \*  \*  \*  \*

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

Defendants are charged in Count I with conspiring to extort, and in Count II with attempting to extort, money from World Trade Transport, Inc. "by the wrongful use of actual and threatened force, violence and fear." The Government's theory is that force and violence were actually used (defendant Zappola is alleged to have struck the president of World Trade Transport, Inc., one John Marano, in the face), and that threats of further force and violence were made. Defendants contend that

whatever actions they took were motivated by their reasonable belief that World Trade Transport, Inc. owed defendants' company M & R Repair, Inc. money as the result of commercial transactions.

■ At the first trial Judge Sand charged the jury, over the Government's objections, that "if you find that the defendant you are considering reasonably entertained a belief that he had a lawful claim to the property or money, then his actions were not wrongful within the meaning of the statute, and you may not convict that defendant of attempted extortion." On remand, the Government again opposes that charge. The issue has been addressed by helpful letters and briefs of counsel, most recently in response to the Court's letter to counsel of September 16, 1981.[1]

■ I conclude, upon further consideration, that defendants were not entitled in law to the charge previously given.[2] It will not be repeated, either within the context of "wrongfulness" or of "intent." I construe the Hobbs Act to proscribe the obtaining of property by force or violence, or by fear engendered by the threat of force or violence; and that a defendant's belief in his entitlement to the property does not constitute a legal defense.

With the sole exception of *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), whose special circumstances are considered *infra*, the parties cite no case, and the Court has found none, where the use of inherently wrongful acts to obtain property has been excused by the actor's belief, or even the assumed fact, that he was entitled to it. On the contrary, a consistent line of authority points the other way; and for sound public policy reasons.

In *United States v. Pignatelli*, 125 F.2d 643 (2d Cir. 1942), defendant was convicted of violating a federal statute forbidding the use of the mails in furtherance of an extortion scheme. Specifically, the statute proscribed the mailing of any communication "addressed to any other person and containing any threat to injure the property or reputation of the addressee or of another..." The defendant, Ludovic Pignatelli, laid claim to the title of "Prince Pignatelli," as did his distant relative, Guido Pignatelli, who had had the good fortune to marry a wealthy widow named Henrietta Hartford. Disputes having arisen between Ludovic on the one hand, and Guido and his wife (now "Princess Pignatelli") on the other, Ludovic sought to obtain substantial amounts from these other individuals, and threatened, in a mailed communication which proved to be his undoing, that if his claims were not settled, he would refer to them in an autobiography he was writing, containing a chapter entitled: "Fakers' Titles in the U.S.A.," listing Guido and Henrietta among the fakers. At trial, Ludovic offered to show that, in fact, he had the sole right to the title of Prince. The Court of Appeals, affirming the conviction, held that this question of entitlement was irrelevant, and the evidence properly excluded. The court reasoned that Ludovic's use of an explicitly illegal means to enforce his perceived right branded him as an extortioner, entirely without regard to the existence *vel non* of that perceived right:

"Threats to damage another's reputation are no proper means for determining a controversy. It may be adjusted either by suit or by compromise but settlement must not be effected by using defamation as a club. The threat to publish the book for such a purpose was unlawful and it made no difference whether Ludovic had

---

1. The Court's letter expressed preliminary, not definitive, views and inquiries. It was written in the belief that counsel's arguments are better informed if counsel are made aware of the tentative workings of the judicial mind.

2. I adhere to the view, previously expressed in the Court's September 16 letter, that the Court of Appeals addressed different issues in order-

ing a new trial in this case, and that its opinion does not foreclose the question under discussion in defendants' favor. Of course, I am not bound by Judge Sand's charge at the first trial, and may respectfully disagree with him without violating the law of the case. Cf. *Evans v. Calmar SS. Co.*, 534 F.2d 519, 521 (2d Cir. 1976).

the sole right to be called Prince or not. Consequently the evidence that he had a superior title was properly excluded." 125 F.2d at 646.

The court in *Pignatelli* found support in a New York State court decision, *People v. Eichler*, 75 Hun. 26, 26 N.Y.S. 998, 999, in which that court, construing a New York statute declaring it a crime to threaten a person with a criminal prosecution for the purpose of extorting money, said:

"The fact that the person who in writing or orally makes such a threat for such a purpose believes, or even knows, that the person threatened has committed the crime of which he is threatened to be accused, does not make the act less criminal."

New York decisions are instructive because the legislative history of the Hobbs Act makes it clear that Congress, in drafting the statute, intended to adopt common law and statutory definitions of extortion, particularly as articulated in New York.[3] For that reason, I attach a particular significance to *People v. Fichtner*, 281 App.Div. 159, 118 N.Y.S.2d 392 (2d Dept. 1952), *aff'd*, 305 N.Y. 864, 114 N.E.2d 212 (1952). Defendants were managers of a supermarket. Having detected a customer in the attempted theft of a jar of coffee, defendants threatened this individual with arrest and resulting adverse publicity, unless he paid the store $75, and signed a paper admitting that during the course of several months he had unlawfully taken merchandise from the store in that amount. Defendants were charged under §§ 850 and 851 of the New York Penal Law. Section 850 provided: "Extortion is the obtaining of property from another . . . with his consent, induced by a wrongful use of . . . fear . . ." Section 851 provided that "fear, such as will constitute extortion," may be induced by a threat to accuse an individual of crime, or to expose him to disgrace. Defendants testified that they honestly believed that the individual had stolen merchandise of the value of $75 over a period of months. The trial court instructed the jury as follows:

". . . to accuse one of the crime of petit larceny or to impute disgrace to him may be lawful under certain circumstances; that where one steals a small amount of money and is threatened with prosecution if he does not return the money, that is a lawful threat because in such a case the intent would be to have the wrongdoer return the amount he owes; on the other hand, if one threatens to prosecute a person unless he pays an amount over and above what is rightfully due, and by such threat it is intended thereby to induce fear in that person, such a threat would be an unlawful threat to do an unlawful injury, and would constitute extortion; . . ." 118 N.Y.S.2d at 395–96.

Defendants appealed their conviction, because the trial judge refused to give the following requested instruction:

". . . if in the judgment of the jury the defendants honestly believed that the amount which the complainant paid or agreed to pay represented the approximate amount of the merchandise which he or they had previously stolen from the Hill Supermarket, then the defendants must be acquitted." *Id.*

Affirming the conviction, the Appellate Division held that not only was the requested charge inappropriate, the charge actually given by the trial court was wrong. The Appellate Division stated:

". . . the portion of the main charge to the effect that, under the circumstances of this case, extortion is committed only when one obtains property from another by inducing fear in that other by threatening to accuse him of crime unless he pays an amount over and above what was rightfully due was more favorable to defendants than that which they were entitled to receive. In our opinion, the extortion statutes were intended to prevent the collection of money by the use of fear induced by means of threats to accuse a debtor of crime, and it makes no difference whether the debtor stole any goods, nor how much he stole, and that defendants may properly be convicted even

---

**3.** See legislative history cited in Government's supplemental memorandum at 6.

though they believed that the complainant was guilty of the theft of their employer's goods in an amount either equal to or less, or greater than any sum of money/obtained from the complainant. Nor is defendants' good faith in thus enforcing payment of the money alleged to be due to their employer a defense." *Id.*

The New York State court in *Fichtner* specifically approved the view of the Second Circuit in *Pignatelli, supra,* 118 N.Y.S.2d at 398, and further observed:

"The law does not authorize the collection of just debts by threatening to accuse the debtor of crime, even though the complainant is in fact guilty of the crime." *Ibid.*

*Fichtner* was cited by the Eighth Circuit in *United States v. French,* 628 F.2d 1069, 1075 (8th Cir. 1980), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980), a Hobbs Act case, as one of several decisions standing for the proposition that:

"Under state law the rule appears to be that one who takes money extortionately cannot defend on the basis that the money collected thereby was in satisfaction of a legitimate debt." *Id.* at 1075.

Discussion in the more recent decisions of the lower federal courts in Hobbs Act cases has centered upon the effect of the Supreme Court's decision in *Enmons, supra.* *Enmons* held, in a five-four decision, that the Hobbs Act did not reach the use of violence by a labor union in its efforts to achieve legitimate union objectives, such as higher wages. In the course of its reasoning, the majority stated that:

" 'Wrongful' has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." 410 U.S. at 400, 93 S.Ct. at 1009.

Defendants convicted of extortion have been relying upon that language ever since. None has succeeded, in view of lower federal courts' limitation of the *Enmons* rationale to the labor union context which gave it

birth. See e. g., *United States v. Porcaro,* 648 F.2d 753 (1st Cir. 1981); *United States v. Cerilli,* 603 F.2d 415, 420 (3d Cir. 1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980); *United States v. French, supra; United States v. Warledo,* 557 F.2d 721, 729–30 (10th Cir. 1977). In *United States v. Clemente,* 640 F.2d 1069, 1077 (2d Cir. 1981), the Second Circuit clearly indicated its approval of the limitation placed upon the *Enmons* defense by the Third Circuit in *Cerilli.*

As in the case at bar, the defendants in *Warledo, supra,* and *Porcaro, supra,* were charged with extortion by the use or threat of physical violence. In *Warledo,* Indians threatened physical violence to personnel and property of a railroad, in furtherance of what they asserted to be a lawful claim against the railroad. Defendants, relying upon *Enmons,* argued that "use of threats of violence or violence to obtain money from the railroad is not a violation of the Hobbs Act unless the illegal means were used to press an unlawful claim against the railroad." 557 F.2d at 729. The Tenth Circuit refused to read *Enmons* so as to reach "this extreme conclusion"; affirming the convictions, the court stated at 730:

"Accordingly, the trial court was not obliged to allow the appellants to explain at length their intentions in seeking money from the railroad through threats of violence or actual violence. Under the facts of this case that intent was not relevant to a showing that their activity was not 'wrongful' within the terms of the Hobbs Act."

In *Porcaro,* the defendants attempted to force certain individuals to pay money for the right to operate a sauna bath, or to vacate the sauna, using threats of physical harm and actual violence, at a time when those individuals had contractual rights to operate the facility. Again, defendants relied in the Court of Appeals upon the *Enmons* decision, seeking to portray themselves as acting in reliance on contractual rights they themselves had in the premises. The First Circuit refused to extend the *Enmons* rationale to such a situation.

Quoting with approval from *Cerilli, supra,* the First Circuit in *Porcaro* said:

> "We concur in this reading of Enmons, and find no basis for extending Enmons to protect from Hobbs Act prosecution the use of force and threats to resolve a contractual dispute among businessmen. Even assuming appellant had a legitimate claim to either the Reading sauna or the $50,000 sale price, his argument that Enmons' reasoning extends beyond labor disputes to eviction cases and the like is unpersuasive." 648 F.2d at 760.

The rationale of these cases, squarely applicable to the case at bar, is that unless a labor union is involved, the use or threat of force or violence brings the case within the Hobbs Act, and it matters not whether the defendant had, or believed he had, a right to the property which comes into his hands as the result of such persuasion. The First Circuit in *Porcaro* stated the proposition succinctly: a Hobbs Act prosecution will lie for "the use of force and threats to resolve a contractual dispute among businessmen."

In *Clemente, supra,* the Second Circuit defined the defendants' "wrongful purpose," sufficient to satisfy the Hobbs Act elements, as "obtaining money to which they had no lawful claim," 640 F.2d at 1078. Previously, the court approved Judge Sand's instruction to the jury that "the wrongfulness element of the crime would be satisfied upon finding that fear of economic loss was employed by the defendants to obtain money to which they were not lawfully entitled." *Id.* at 1077. However, in *Clemente* the means of persuasion used was a fear of economic loss, resulting from the allocation or non-allocation of contracts; the court was obliged to deal with the defendants' contention that "the use of fear of economic loss is not inherently wrongful, but rather represents a device routinely used in legitimate business transactions," *id.* at 1077. Precisely because that was true, the Government was required in *Clemente* to prove that defendants had no lawful claim to the money which they obtained by means not inherently wrongful. The heart of the *Clemente* rationale lies in this sentence, at 1077:

"Fear of economic loss is not an inherently wrongful means; however, when employed to achieve a wrongful purpose, its 'use' is wrongful."

In the case at bar, the defendants cannot be heard to argue that fear of physical force or violence "is not inherently wrongful." Because fear thus engendered *is* inherently wrongful, no purpose or objective may redeem it; and it is irrelevant that defendants were owed money by the victims of such fear, or "reasonably believed" that to be the case. The situation is entirely analogous to those presented in *Pignatelli* and *Fichtner, supra,* where the means used to obtain money were explicitly and unequivocally proscribed by the relevant statutes. Because that was so, those means were inherently unlawful; and the defendants' perceived rights to the property did not take the cases outside the extortion statutes.

■ There is a symmetry to these propositions which appeals to public policy and common sense. Extortion consists of the use of wrongful means (force, violence, or fear thereof) to achieve an otherwise proper objective (satisfaction of a legitimate debt); *or* use of an otherwise proper means (fear of economic loss) to achieve a wrongful objective (obtaining property to which there is no legal entitlement). The defendant's entitlement to the property in question is pertinent to the second category of case, illustrated by *Clemente*; but it is not pertinent to the first category, illustrated by *Porcaro, Warledo, Pignatelli,* and *Fichtner.*

This analysis reconciles all the cited cases. *Cerilli, supra,* as analyzed by the Second Circuit in *Clemente* at 1077, involved the inherently wrongful extortion of funds by public officers from contractors as a condition of doing business with the municipality; the defendants were not saved from Hobbs Act prosecution by the fact that the payments thus obtained were used for political contributions, an otherwise lawful objective. *Cerilli* thus falls within the first of the two categories summarized *supra; Clemente* falls within the second.

In *United States v. Arambasich*, 597 F.2d 609 (7th Cir. 1979), cited by the Court to counsel, the defendant was a construction worker whose brother, a union business agent, used his powers to extort payments from contractors to avoid labor problems. On occasion, defendant's brother used those powers to require contractors to "hire" defendant. Defendant would appear at the job site and receive his pay, although he "seldom, if ever, did any work whatsoever." 597 F.2d at 610. The defendant's means of collection—a workman requesting compensation at a job site—was not inherently unlawful. In those circumstances, the trial judge appropriately charged the jury that to convict defendant under the Hobbs Act, the government had to show that defendant "received the payments from the company knowing that he was not legally entitled to receive them and knowing that they were made because the company feared economic harm." In short, *Arambasich* is a second category case.

Defendants cite *United States v. Poludniak*, 657 F.2d 948 (8th Cir. 1981). I do not see that the case assists them. In *Poludniak*, the prosecution lay not under the Hobbs Act, but under 18 U.S.C. § 875(d), which prohibits extortion by telephone calls, in language paralleling the mail extortion statute involved in *Pignatelli, supra*. The defendants, a niece of Senator Eagleton of Missouri and her attorney, threatened the senator and an officer of a company controlled by the Eagleton family with exposure to adverse publicity, in an effort to pressure the company to buy out the niece's interest. Defendants were permitted to testify—without government objection, so far as it appears—that they "both considered that they believed their activity was conducted in good faith without any criminal intent, in order to obtain money for Ms. Weigand's interest in Missouri Pipefittings after Thyson and Senator Eagleton had refused to deal with them on any other basis." At 958. On appeal, defendants challenged the sufficiency of the Government's evidence on intent. Rejecting that contention, the Eighth Circuit said:

"This argument also fails. Defendants both admitted doing all the acts cited by the government as 'overt acts' in furtherance of the conspiracy. There was no claim of accident or mistake; they admitted that they made the threats in order to get the money. It was for the jury to decide whether to believe that the defendants thought their actions were legal. The jury was correctly instructed on specific intent (defendants do not quarrel with those instructions), and defendant Weigand *had the additional advantage* of her advice-of-counsel argument. The jury was instructed that the government must prove that defendants acted willfully, with specific intent 'to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.' The jury was also correctly instructed that there is a presumption that every person knows what the law forbids, but that ignorance of the law is to be considered by the jury in determining whether or not the defendants acted or failed to act with specific intent. The jury had ample opportunity to consider this issue and apparently rejected defendants' contentions. We will not disturb that verdict." At 958.

The jury charge on intent approved by the court in *Poludniak* closely parallels Judge Sand's standard charge on the same subject given at the first trial (Tr. 738), as to which the Government makes no objection.

Counsel for Zappola argue that, even in a case where the means of obtaining property are inherently unlawful, a defendant's reasonable belief in entitlement constitutes a defense to a Hobbs Act prosecution. "If it were otherwise, then every ill conceived and unrealized demand for payment would be a potentially indictable offense under § 1951." Bergman letter of September 23, 1981 at p. 2. This *in terrorem* argument does not withstand analysis. It is not "every ill conceived and unrealized demand" which falls within the first category of Hobbs Act cases, but only those demands which are asserted in an inherently unlawful manner, the use or threat of physical violence being an obvious example.

In sum, I construe the Hobbs Act to mean that you cannot beat someone up to collect a debt, even if you believe he owes it to you. For that reason, and in the light of the foregoing authorities, I will not give the charge which Judge Sand gave at the first trial of these defendants.