UNITED STATES of America, Appellee,

v.

George ZAPPOLA and Robert Melli, Defendants-Appellants.

Nos. 910, 911, Dockets 81–1488, 81–1490.

United States Court of Appeals, Second Circuit.

Argued March 22, 1982.

Decided April 30, 1982.

Anne C. Feigus, New York City (Ronald P. Fischetti, New York City, of counsel), for defendant-appellant Robert Melli.

Paul B. Bergman, New York City (La-Rossa, Brownstein & Mitchell, New York City, of counsel), for defendant-appellant George Zappola.

Thomas Fitzpatrick, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., S.D.N.Y., Gerard E. Lynch, Mark F. Pomerantz, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before LUMBARD and OAKES, Circuit Judges, and FRIEDMAN,* Chief Judge, Court of Claims.

LUMBARD, Circuit Judge:

This appeal turns on whether defendants, charged with attempted extortion and conspiracy to extort, may assert, as a defense, that their demands for compensation for business losses caused by their intended victims were made in the reasonable belief that the victims owed them such compensa-

---

* Honorable Daniel M. Friedman, Chief Judge, Court of Claims, Washington, D. C., sitting by designation.

tion. We hold that the district court did not err in refusing to charge that such reasonable belief is a defense. The defendants, George Zappola and Robert Melli, were convicted in the Southern District of New York, Haight, J., of attempted extortion in violation of the Hobbs Act, 18 U.S.C. §§ 1951 & 2 (1976), following a ten-day jury trial that ended on October 21, 1981. On December 11, 1981, the court sentenced Zappola to nine years imprisonment and Melli to six years. Finding no error, we affirm.

### I.

George Zappola and Robert Melli owned and operated the M&R Repair Co. ("M&R"), which repaired containers for shipping companies at its lot in Newark, New Jersey. Its largest client was Japan Line, Inc., a large shipping company centered in Port Newark. In 1976 and 1977, the containers were delivered to M&R by World Trade, Inc., a trucking company owned by John Marano, William Ross, and Harold Hagy. At the direction of Japan Line, World Trade would move containers and container chassis to and from piers, railyards, and repair and depot facilities.

In early 1977, World Trade stopped delivering containers to M&R for repair work, and began sending them to a competing shop, Maher Terminals. There is some evidence that the diversion of Japan Line containers was directed by Marano, whose son-in-law, Joseph DeNicholas, and former employee, Louis Fenza, both worked at Japan Line. Meanwhile, Marano surreptitiously approached Japan Line with a proposal to start a joint venture to do Japan Line's storage and repair work. He had previously discussed a joint venture with Zappola.

In May of 1977, Zappola began to notice the sharp drop in business in his yard. He called Marano to ask if he knew why containers were no longer being delivered to M&R and Marano replied that the World Trade simply brought the containers wherever Japan Line directed.

On June 6, 1977, Marano received a call asking him and Ross to come to M&R.

Marano and Ross went over to the M&R office, which was in a trailer in the M&R repair yard. Zappola and Melli were waiting for them in the back room. Zappola began cursing and yelling, accusing them of stealing his business by diverting containers to another facility. Zappola claimed that as a result he had lost $38,000. Pulling a gun on Marano, Zappola said, "You're the SOB that's doing it."

Marano denied the accusations, but Zappola was not appeased. He smashed Marano in the face, sending Marano's glasses flying and cracking a tooth. As Marano tried to stem the flow of blood from his mouth and nose, Zappola demanded that Marano and Ross make good M&R's losses from the diverted containers. Crying, pleading, Marano tried to explain that the decision to divert the containers was Japan Line's and he had nothing to do with it. Zappola called him a liar, fired the gun into the wall, and smashed Marano in the face again, almost knocking him out of the chair.

Before releasing Marano and Ross, Zappola turned to Melli and asked him to search the two to see if they were "wired," adding that if they were, "I'll kill them right now."

Satisfied that his message had been delivered, Zappola told the two to get out while they still could. "We'll be in touch," was his parting shot.

Marano reported this conversation to the FBI, with whom he had been cooperating in an unrelated matter. The FBI monitored Marano's future contacts with the defendants.

On Wednesday, June 22, 1977, Marano and Melli met at the Holiday Inn in Jersey City. Melli demanded that Ross and Marano pay him and Zappola $39,000 "by Friday" and implicitly threatened them with violence if they failed to pay up. He began with the claim that "we were fleeced thirty-nine six, by your business. . . . Look, we're short thirty-nine thousand, six hundred dollars. . . . We got f***. We, wanna get paid."

Melli made it perfectly clear that he expected Marano and Ross to make good M&R's loss: "You got to the end of week to come up with it. . . . Give me that f*** money." Nor did he shy away from suggesting the consequences of not paying: "I'm not gonna argue with you. . . . I don't want to hear no for an answer. . . . If you're gonna pay, then we forget about it. I'm not going to take any more of it. There's nothing left to be said. . . . I don't have to prove to anybody I'm a tough guy. I know what I am."

Melli also noted that Zappola had not even wanted him to come and speak with Marano, and implied that he was doing Marano a favor by giving this last warning: "Georgie didn't even want me to come up and talk to you. He had in his head what he wanted to do. . . . He comes over there, there's no turning around." By contrast, Melli acted like a nice guy: "[I'm] gonna give you the courtesy to come down and say what I gotta say, and that's it." However, Melli was not negotiating, but delivering an ultimatum: "Once I finish, that's the end of it. I'm leaving it in your hands." If Marano and Ross wanted to "go into details, [they should] go see the other guy. Go see Georgie."

In the same conversation, Melli warned Marano to tell Ross to keep Ross's two sons away from the M&R yard, where they apparently had caused some trouble. "If he sends Gary and Roger over to that yard with an attitude, he's gonna be the sorriest guy in this world. Those two f*** sons, they're gonna come back to him in sections. . . . If they wanna talk there like tough guys, we'll show 'em what tough guys are." Melli tied the threats to Ross's sons with the demands for the $39,000: "For their own good, keep them out of the yard. So, you give me the answer Friday. In the morning, call me up. If not, call George up." And again: "They wanta come down and gorilla us? No way. We'll send them back in sections. Tell him I said so. John, I'm gonna leave. I'll hear from you Fri, ahh, tomorrow or Friday. You tell me yes, no."

Melli concluded with a thinly veiled threat: if Marano and Ross failed to pay by Friday, "Whoever's left will take care of it."

In the next few days Marano spoke three times on the phone with Zappola. Each time Zappola repeated his claims that Marano had stolen business from M&R. However, Zappola was very circumspect on the phone, making no outright threats or demands for money. He said things like, "I'm still not gonna sit still for it." "Don't mistake my kindness for weakness, John." But when Marano asked, "George, what's the bottom line? What do we do?" Zappola answered, "I don't know, John. I don't know." When Marano told Zappola that Melli had asked for $40,000 and complained that he couldn't raise that kind of cash, Zappola replied, "If you would have did it the right way I would have given you the shirt off my back."

Zappola, Melli, Marano, and Ross next met on Monday, June 27, 1977, at Ponte's Restaurant near the docks on New York's lower West Side. Zappola again claimed that Marano was responsible for M&R's losses, adding that "the clock was still running and now it's up to $42,000 that [Marano and Ross] owed him." Marano and Ross tried unsuccessfully to convince the defendants that they were not responsible for the diversion of the containers from M&R. As the meeting ended, Melli said, "It's $40,000 and we want it by Friday." Zappola added, "We'll be in touch."

Neither defendant took the stand at trial. The defense produced witnesses to support the claim that Marano was stealing M&R's repair business and to rebut the testimony that Zappola fired a gun in the M&R trailer.

II.

The critical issue for the district court was the charge on wrongfulness. In the first trial of these defendants, Judge Sand, over government objection, charged that the jury must acquit if it found that the defendants reasonably believed they were legally entitled to the money they demand-

ed from Marano and Ross. In spite of the favorable charge, the defendants were convicted on two counts each, but we reversed, holding it was error for the district court to rule that a potential witness was unavailable. 646 F.2d 48 (2d Cir. 1981). At the retrial, Judge Haight ruled in the government's favor on the issue of wrongfulness, holding in a memorandum opinion entered on September 29, 1981, that "unless a labor union is involved, the use or threat of force or violence brings the case within the Hobbs Act, and it matters not whether the defendant had, or believed he had, a right to the property which came into his hands as the result of such persuasion." 523 F.Supp. 362, 366. Judge Haight declined to give the charge that Judge Sand had given, instead charging the jury as follows:

[I]f you find that the government has proved beyond a reasonable doubt that a particular defendant used or threatened force or violence or attempted to induce fear for the prohibited purpose of obtaining money with his victim's consent, then the element of wrongfulness has been satisfied and in that circumstances it makes no difference whether the defendant was actually owed any money by the victims or thought he was. That is because the law does not permit the use or threat of force or violence or fear induced thereby to collect debts.

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (1976). The legislative history reveals that Congress meant to define extortion as it was defined by the states, in particular, New York. *United States v. French*, 628 F.2d 1069, 1073 (8th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980). Said Rep. Hancock, "The bill contains definitions of robbery and extortion which follow the definitions contained in the Laws of the State of New York." 91 Cong.Rec. 11900 (1945). Rep. Robsion agreed, and added that those were also the laws of the other 47 states: "The definitions of robbery and extortion

set out in this bill are the same definitions set out in the New York State code of laws and are defined in substantially the same way by the laws of every State in the Union." *Id.* at 11906. As Congress meant to incorporate the law as it stood in 1945 of New York and her sister states, those laws are the proper starting point in determining whether extortion under the Hobbs Act encompasses the extraction by force and threats of property one believes to be one's own. Of course, we may presume that Congress was aware of the settled interpretations of the state laws of extortion to which it referred. *See Int'l Union of Journeymen, Local 141 v. NLRB*, 675 F.2d 1257, 1260 (D.C.Cir. 1982); *Air Transport Ass'n of America v. Professional Air Traffic Controllers Organization*, 667 F.2d 316, 321 (2d Cir. 1981).

By 1942, it was clear to this court that the New York courts no longer recognized a good-faith claim to the property as a defense to extortion. *United States v. Pignatelli*, 125 F.2d 643, 647 (2d Cir.), *cert. denied*, 316 U.S. 680, 62 S.Ct. 1269, 86 L.Ed. 1754 (1942). A few years later, the New York courts expressly approved *Pignatelli's* view of New York law. *People v. Fichtner*, 281 App.Div. 159, 118 N.Y.S.2d 392 (2d Dep't), *aff'd* 305 N.Y. 864, 114 N.E.2d 212 (1952). Nor did New York's sister states recognize any kind of good faith claim to the property as a defense to extortion. In *State v. Bruce*, 24 Me. 71 (1844), the court held:

A person whose property has been stolen cannot claim the right to punish the thief himself without process of law, and to make him compensate him for the loss of his property by maliciously threatening to accuse him of the offense, *or to do an injury to his person or property, with intent to extort property from him.*

(emphasis added). *Accord, People v. Beggs*, 178 Cal. 79, 172 P. 152 (1918); *State v. Phillips*, 62 Idaho 656, 115 P.2d 418 (1941); *Commonwealth v. Coolidge*, 128 Mass. 55 (1880); *In re Sherin*, 27 S.D. 232, 130 N.W. 761 (1911). We conclude that by adopting

the states' statutory law of extortion, Congress meant to punish as extortion any effort to obtain property by inherently wrongful means, such as force or threats of force or criminal prosecution, regardless of the defendant's claim of right to the property.

Defendants' reliance on *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), is misplaced. In *Enmons*, the defendants fired high powered rifles at three transformers belonging to their employer and blew up a transformer substation in the course of a strike. By a 5–4 vote, the Supreme Court held that these acts did not constitute extortion under the Hobbs Act. Zappola and Melli argue that they are in the same position as the *Enmons* defendants—they used force in pursuit of a legitimate goal; in their case, the recovery of a debt, in *Enmons*, higher wages. However, we agree with the other circuits that have addressed this issue that *Enmons* merely carved out a labor exception to the traditional law of extortion codified in the Hobbs Act. *United States v. Porcaro*, 648 F.2d 753 (1st Cir. 1981); *United States v. French*, 628 F.2d 1069, 1075 (8th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980); *United States v. Warledo*, 557 F.2d 721, 728–30 (10th Cir. 1977); *see also United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir.), *cert. denied sub nom. Fiumara v. United States*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981) (fear of economic loss used to obtain property not belonging to defendants *held* extortion); *United States v. Cerilli*, 603 F.2d 415, 418–21 (3d Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980) (solicitation of political contributions *held* not a lawful purpose similar to the seeking of higher wages in *Enmons* ).

In *Enmons*, the Supreme Court relied principally on the legislative history of the Hobbs Act indicating that Congress did not want to reach labor violence during a strike. A number of pro-labor Congressmen opposed the Hobbs bill on the ground that it could be used against unions engaged in strikes, boycotts, or other militant labor activity. In response, Rep. Michener said, "In my opinion this bill will not interfere with legitimate strikes. It is not so intended." 91 Cong.Rec. 11843 (1945). Rep. Sumners, another supporter of the bill, agreed: "There is nothing in this bill dealing with persons connected with organized labor as such." *Id.*

Rep. Celler, a staunch friend of labor and an opponent of the Hobbs bill, objected that the bill would make a federal crime out of every little bit of violence that occurs on a picket line: "It is unfortunately true that in some instances in the heat of labor disputes there will be minor altercations on the picket line. There will be occasional scuffles between partisans. Under the Hobbs bill every such altercation is automatically raised to the level of a Federal offense." *Id.* at 11901. Responding to these concerns, Rep. Sumners said, "... insofar as I understand this bill, there is not a thing in it to interfere in the slightest degree with any legitimate activity on the part of labor people or labor unions, unless somebody thinks it is legitimate for them to rob and extort." *Id.* at 11908. Added Rep. Jennings, "This does not have a thing in the world to do with strikes." *Id.* at 11912.

Relying on these and other comments, the Supreme Court held that "the Hobbs Act did not sweep within its reach violence during a strike to achieve legitimate collective-bargaining objectives." 410 U.S. at 404, 93 S.Ct. at 1012. As none of the legislative history on which the Court relied to reach this conclusion sheds any light on the other contexts in which the Hobbs Act might be applied, we see no reason to extend *Enmons* to non-labor cases in derogation of Congress's express intent to incorporate the traditional state law of extortion.

■ The appellants place great weight on the Court's construction of the word "wrongful" in the Hobbs Act. Although the Court used broad language in stating that the word applied only where "the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to the property," 410 U.S. at 400, 93 S.Ct. at 1009–1010, the Court

applied this principle only to examples of union violence. It gave no examples where violence was employed outside the labor context to obtain property. Hence, we do not find this language applicable here, where two businessmen beat and threatened a third businessman to coerce the payment of an alleged debt. We conclude that the district court did not err in instructing the jury in accordance with the law of extortion as "the courts of the States of this country" understood it in 1945. 91 Cong. Rec. 11900 (1945) (remarks of Mr. Hancock).

### III.

The defendants' other claims of error in rulings of the district court are likewise without merit. Zappola asserts that the court erred in admitting Melli's June 22 conversation with Marano against him, arguing that his instructions to Melli not to go speak to Marano (as reported by Melli to Marano) disassociated him from the threats Melli made there. However, the clear import of Melli's remarks were that Zappola had already made up his mind to use force and was not prepared to discuss the demand for money at all. Moreover, the jury need not have believed that Zappola ever told Melli not to speak with Marano.

Nor did the court err in refusing to redact Melli's threats against Ross's sons, as the jury could have found those threats were calculated to convince Marano and Ross that Melli was a "tough guy" who wouldn't hesitate to use force to back up his demand for money.

Finally it was not error to admit Marano's testimony that he had seen a handgun at Zappola's house six months before Zappola fired a handgun in Marano's presence in the M&R trailer. As counsel argued that Zappola never threatened Marano with a handgun, such evidence was properly admitted as probative of his access to such a weapon. *See United States v. Robinson*, 560 F.2d 507, 513 (2d Cir. 1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). Nor can we say it was an abuse of discretion for the trial judge to find that the probative value of this evidence outweighed the risk of prejudice.

Affirmed.