**UNITED STATES of America,**
**Appellee,**

v.

**Autumn JACKSON, Boris Sabas, also known as Boris Shmulevich, and Jose Medina, also known as Yosi Medina, Defendants–Appellants.**

Nos. 97–1711, 97–1721 and 98–1171.

United States Court of Appeals,
Second Circuit.

Argued June 22, 1998.

Decided June 9, 1999.

Paul A. Engelmayer, Assistant U.S. Atty., New York, NY (Mary Jo White, U.S. Atty. for the Southern District of New York, Lewis J. Liman, Ira M. Feinberg, Asst. U.S. Attys., New York, NY, on the brief), for Appellee. Edward S. Zas, New York, NY (The Legal Aid Society, Federal Defender Div., Appeals Bureau, New York, NY, on the brief), for Defendant-Appellant Jackson.

Donald Etra, Los Angeles, CA, for Defendant-Appellant Sabas.

Neil B. Checkman, New York, New York (Beverly Vanness, on the brief), for Defendant-Appellant Medina.

Before: WINTER, Chief Judge, VAN GRAAFEILAND and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Autumn Jackson, Jose Medina, and Boris Sabas appeal from judgments of conviction entered in the United States District Court for the Southern District of New York following a jury trial before Barbara S. Jones, *Judge*. Jackson and Medina were convicted of threatening to injure another person's reputation with the intent to extort money, in violation of 18 U.S.C. §§ 875(d) and 2 (1994); all three defendants were convicted of traveling across state lines to promote extortion, in violation of the Travel Act, 18 U.S.C. §§ 1952(a)(3) and 2 (1994), and conspiring to commit extortion, in violation of 18 U.S.C. § 371 (1994). Sabas was found not guilty of making extortionate threats. Jackson, Medina, and Sabas were sentenced principally to 26, 63, and 3 months'

imprisonment, respectively, with each defendant's term of imprisonment to be followed by a three-year period of supervised release. On appeal, defendants contend chiefly that the district court failed to give proper jury instructions as to the nature of extortion. For the reasons that follow, we agree, and we accordingly vacate the judgments and remand for a new trial.

## I. BACKGROUND

The present prosecution arises out of defendants' attempts to obtain up to $40 million from William H. ("Bill") Cosby, Jr., a well-known actor and entertainer, by threatening to cause tabloid newspapers to publish Jackson's claim to be Cosby's daughter out-of-wedlock. The witnesses at trial included Cosby, Jackson's grandmother, persons who had conversations with Jackson in which she demanded money from Cosby and threatened to injure his reputation if he did not pay, and a cooperating witness who had attended meetings during which defendants formulated and executed parts of their plan. The government also introduced, *inter alia*, recordings of messages left by Jackson, recordings of conversations in which Jackson demanded money from Cosby and threatened to injure his reputation if she were not paid, and documents found in the possession of Medina and Sabas. Taken in the light most favorable to the government, the evidence showed the following.

### A. *Jackson's Relationship With Cosby*

In the early 1970s, Cosby had a brief extramarital affair with Jackson's mother, Shawn Thompson. After Jackson was born in 1974, Thompson told Cosby that he was the father. Cosby disputed that assertion, and according to Jackson's birth certificate, her father was one Gerald Jackson. Jackson's grandmother testified, however, that she and Thompson told Jackson, as Jackson was growing up, that Cosby was her biological father. The grandmother told Jackson that Cosby had said that, so long as they "didn't tell anyone about it, that he would take care of her mother and her, and take care of his responsibility." (Trial Transcript ("Tr."), 1459.)

For more than 20 years after Jackson's birth, Cosby provided Thompson with substantial sums of money, provided her with a car, and paid for her admission to substance-abuse treatment programs. Thompson repeatedly telephoned him saying that she needed money, and in the course of the conversations she would usually reiterate her claim that Cosby was Jackson's father and state that she did not want to embarrass Cosby's wife. Between 1974 and mid–1994, Cosby gave Thompson a total of more than $100,000, typically having traveler's checks or cashier's checks issued in the name of an employee rather than his own name. In 1994, Cosby established a trust fund for Thompson, which was administered by John P. Schmitt, a partner in the New York City law firm that represented Cosby. The trust fund provided Thompson with $750 a week for as long as Cosby chose to fund the trust. Thompson received approximately $100,000 in payments from this fund from mid–1994 until the fund was exhausted, and not replenished, in early 1997.

In addition, Cosby, who had funded college educations for some 300 persons outside of his own immediate family, and had spoken with Jackson by telephone at least once during her childhood, had offered to pay for the education of Jackson and of Thompson's other two children. In about 1990, after a telephone conversation with Jackson's grandmother, Cosby became concerned that Jackson's education was being hampered by conditions at her California home, and he arranged to have Jackson finish high school at a preparatory school in Florida associated with a Florida college. Cosby thereafter also created a trust to pay for Jackson's college tuition and for certain personal expenses such as food, rent, utilities, and medical costs while Jackson was attending college. This trust

was administered by Schmitt's law partner Susan F. Bloom. Jackson subsequently enrolled in a community college in Florida. While Jackson was in school, Cosby spoke with her by telephone approximately 15 times to encourage her to pursue her education, telling her that although he was not her father, he "loved her very, very much" and would be a "father figure" for her. In these conversations, she addressed him as "Mr. Cosby."

In April 1995, Bloom learned that Jackson had dropped out of college, and Bloom therefore ceased making payments to Jackson from the college education trust. From the spring of 1995 until December 1996, Jackson had no contact with Cosby or any of his attorneys.

B. *The Events of December 1996 and early January 1997*

In the fall of 1996, Jackson and her then-fiancé Antonay Williams were living in California and working for a production company in Burbank, California, headed by Medina. Medina's company, which operated out of his hotel suite, was attempting to produce a children's television show. Jackson, Williams, and Sabas had acting roles in the show; along with cooperating witness Placido Macaraeg, they also had administrative positions. Jackson worked without pay, but she expected to receive a commission when the television show was sold.

In December 1996, Jackson reinitiated contact with Cosby. Within a four-day period, she telephoned him seven times and left urgent messages asking him to return her calls. In one instance, Jackson identified herself as "Autumn Cosby," a message that Cosby perceived as "some sort of threat." (Tr. 850.) When he returned Jackson's call, he reproached her for using his name. Jackson described the project on which she was working, told Cosby that she was homeless, and asked him to lend her $2100. Cosby initially refused and suggested that she instead get an advance from the person for whom she

was working. After further reflection, Cosby called Jackson back and agreed to send her the $2100 she had requested, plus an additional $900; he urged her to return to school, and he renewed his offer to pay for her education. Cosby directed his attorneys to tell Jackson that he would pay for her education and related expenses if she returned to school, maintained a B average, and got a part-time job. Bloom sent Jackson a letter dated December 13, 1996, setting out the conditions and requesting, if Jackson agreed to the conditions, that Jackson sign and return a copy of the letter to Bloom. Jackson did not comply.

On January 2 and 3, 1997, Jackson spoke with Bloom and Schmitt by telephone and asked that she be sent money for food, lodging, and tuition. Bloom responded that Jackson had not shown that she was enrolled in school. Bloom and Schmitt reiterated that Cosby would not pay for Jackson's support until she enrolled in school and secured employment for eight hours a week; they advised her that her unpaid work at Medina's production company did not satisfy the condition that she get a part-time job.

Following this rejection of her request for money, Jackson made a series of calls to business associates of Cosby, threatening to publicize her claim to be his daughter and thereby harm his reputation. For example, on January 6, she left a voicemail message for an administrator at Eastman Kodak Company, whose products Cosby has endorsed. The administrator testified that the caller "said that she was Autumn Jackson, she was the daughter of Dr. William J. [*sic*] Cosby, Jr., that she knew that Mr. Cosby had a contract with Kodak, and that it was very important that I call her, she was calling in regards to their relationship and his actions or nonactions, and that she was prepared to go to [a] tabloid." (Tr. 121.)

Also on January 6, Jackson left a voicemail message for Peter Lund, president

and chief executive officer of CBS, whose television network currently carried Cosby's prime-time program. Stating that her name was Autumn Jackson, Jackson said:

> I am the daughter of Doctor William Cosby, Jr. I need to speak with you, um, regarding, regarding [*sic*] this relationship, um, that he and I have, and how this will affect CBS if I go to any tabloids.... This is of the ... utmost importance to CBS and his, uh, welfare, so I would, I would [*sic*], uh, guess that you would need to call me back as soon as possible.

(Government Exhibit 1R1T.) On January 7, Jackson called Lund's office at CBS again, leaving a second message identifying herself as Cosby's daughter and stating that if she were not called back promptly "she would go to the tabloids." (Tr. 93.)

Later on January 7, Jackson telephoned Schmitt and asked if there was any chance that Cosby "would send her money to live on." (Tr. 482.) When Schmitt responded in the negative, Jackson said that if she did not receive money from Cosby, she would have to go to the news media. Schmitt testified that he replied that if Jackson meant that "she was planning to go to the news media with what she believed was damaging information and would refrain from doing so only if Mr. Cosby paid her money, that that was extortion, that was both illegal and disgraceful." (*Id.*) He also told her that "extortion is a crime in every state." (Tr. 483.) Jackson stated that she had "checked [it] out and she knew what she was doing." (Tr. 482–83.)

During the week of January 6, Jackson and Medina discussed ways to intensify the pressure on Cosby and his corporate sponsors. These discussions took place at the evening meetings of Medina's production staff in the presence of Sabas, Williams, and Macaraeg. Macaraeg testified that the discussions resulted in, *inter alia*, the mailing on January 10 and 11 of company solicitation letters that, without mentioning Cosby by name, included a paragraph referring to Jackson as the daughter of a "CBS megastar" who was "CBS's most prized property," and stating that, contrary to the star's public image as an advocate of parenting, the star had left Jackson "cold, penniless, and homeless." (Tr. 968.) Letters containing this paragraph were sent to the President and Vice President of the United States, the Governor of California, the Mayor of New York City, CBS, Eastman Kodak, Philip Morris Company, which was another Cosby sponsor, two publishing companies that had published Cosby's books, and many other companies. Medina explained that the paragraph would affect Cosby's sponsors, "put pressure on Bill Cosby," and "help Autumn out." (Tr. 956.)

### C. *The Events of January 15–18, 1997*

On January 15, 1997, after the telephone calls and letters of the week before had failed to produce the desired results, Medina and Jackson contacted Christopher Doherty, a reporter for *The Globe* tabloid newspaper. Medina and Jackson told Doherty that Cosby was Jackson's father and asked what her story would be worth. To support the story, Medina described for Doherty an affidavit in which Jackson had stated (falsely) that Cosby admitted his paternity. Medina faxed Doherty a copy of Bloom's December 13, 1996 letter to Jackson setting out the terms under which Cosby offered to pay Jackson's tuition. After some negotiation of terms, Doherty agreed that *The Globe* would purchase the rights to Jackson's story of her relationship to Cosby for $25,000.

That evening, Doherty brought to Medina's hotel a "source agreement," for the signatures of both Jackson and Medina, setting forth the terms under which *The Globe* would buy the rights to Jackson's story. Doherty did not get to meet with Jackson or Medina but dealt instead with Williams, who relayed a number of requests for modifications of the contract.

Doherty agreed to accommodate all of their requests, but Jackson and Medina refused to sign the source agreement, saying they would deal with it the next day.

The agreement with *The Globe* was never signed. Instead, on the following morning, January 16, Jackson faxed a copy of the agreement, after obliterating the $25,-000 price, to Schmitt. In addition, Jackson faxed Schmitt a letter stating, "I need monies and I need monies now." Jackson's letter stated that it was "urgent" that Schmitt contact her and "make certain arrangements" and asked Schmitt to have Cosby call her that day. The letter concluded:

> If I don't hear from you by today for a discussion about my father and my affairs, then I will have to have someone else in CBS to contact my father for me. I want to talk to my father because I need money and I don't want to do anything to harm my father in any way, if at all possible to avoid.

> Enclosed you will find a copy of a contract that someone is offering monies for my story, which is the only property I have to sell in order to survive.

(Government Exhibit 33.) The fax cover letter directed Schmitt to "R.S.V.P." to Jackson in Medina's hotel suite.

Schmitt called Jackson later that morning. Medina, Jackson, Williams, Sabas, and Macaraeg were present when Schmitt called. With Medina mouthing words and passing notes to Jackson, Jackson and Schmitt had the following conversation, in which Jackson asked for $40 million:

SCHMITT: I, I received your letter, Autumn.

JACKSON: Okay.

SCHMITT: [Clears throat] How, how much money are you asking for, Autumn?

JACKSON: I'm wanting to settle, once and finally.

SCHMITT: What, what are you asking for?

JACKSON: I'm asking for 40 million, to settle it completely [pause].

SCHMITT: And if our answer to that is no?

JACKSON: Well, like I said, I have offers, and I will go through with those offers.

SCHMITT: And those offers are to sell your story to the Globe? [Pause]. Autumn, are you there?

JACKSON: Yes I am.

SCHMITT: Is that what you're referring to, the contract that you sent me, that, for sale to the Globe of your story?

JACKSON: Them, as well as any others. [Pause].

SCHMITT: Well, I'm, I'm sure you know the answer to that is no, Autumn. Thank you very much.

(Government Exhibit 22E8T, at 1.) Jackson asked to have her "father" call her; Schmitt responded that Jackson's father was "Mr. Jackson," and that she should "not expect a call from Mr. Cosby." (*Id.* at 1–2.) Macaraeg testified that when the conversation ended, Jackson looked frustrated and told the group that Schmitt "doesn't understand the meaning of the term settlement," and Medina said, "if [Cosby] doesn't want this to get out, he's going to have to pay a lot of money." (Tr. 995.) Jackson nodded.

Some hours later, Jackson and Medina faxed a letter to CBS president Lund. They attached a copy of the unsigned source agreement with *The Globe,* again with the price redacted. In the letter, which was signed "Autumn J. Jackson–Cosby" and bore the heading "ATTENTION: PLEASE FORWARD THIS LETTER TO MY FATHER, WILLIAM H. COSBY, JR.," Jackson said that Cosby's failure to acknowledge her as his daughter had left her mentally anguished and financially impoverished. Jackson said that because of her "unconditional love ... for [her] father" she did not wish to harm Cosby, his sponsors or publishers, or CBS "[i]n any way, if at all possible to avoid."

(Government Exhibit 4.) However, she made reference to the contract with *The Globe*, saying "if you and my father cannot help me, [it] may possibly be my only means of survival." (*Id.*) Jackson's letter to Lund concluded:

> I am willing to decline this offer and all others upon a fair settlement. If my father, CBS, and you are not interested in this settlement, then I am quite sure that NBC, ABC, and other networks will have an interest in hearing my story of desperation reaching out for my father's love.... [Cosby's] show and his private life just happens [*sic*] to be one of your best properties and this disclosure ... could undoubtedly effect [*sic*] your ratings negatively.

(*Id.*)

When Schmitt informed Cosby of Jackson's demand for $40 million dollars, Cosby responded that he would not pay, and he directed Schmitt to tell Thompson, Jackson's mother, of her daughter's conduct. The next morning, January 17, Schmitt telephoned Thompson and told her that Jackson "was attempting to extort money from Mr. Cosby, and she was threatening to go to the Globe with her story unless she were paid a lot of money." (Tr. 509.) Thompson then attempted to call Jackson at Medina's hotel suite, but reached only Medina. In a conversation tape-recorded by Medina, Thompson stated that Jackson was committing a crime by attempting to "blackmail" Cosby:

> Autumn for some reason has painted herself into a corner. Instead of doing what ... he asked her to do, which is go to school, enroll, ... [s]he has tried to blackmail him.... I think they used your fax machine.... Um, and said if they don't give her an exorbitant amount of money, that she's going to go to the tabloids with her story, and the talk shows.... [S]he's also told them that she has an unsigned ... contract with Globe magazine to tell her story. Now, that's extortion when you do it like that. If she was just going to tell her story,

that's what she should have done. But by calling him, calling the attorneys, and talking with the attorney saying "if you don't give me this money, then I'm going to do that" it's called extortion, it's a federal offense.

(Government Exhibit 24E2R2.) That afternoon, Cosby instructed Schmitt to report Jackson's threats to the Federal Bureau of Investigation ("FBI").

At the direction of the FBI agents, Schmitt telephoned Jackson for the purpose of allowing the agents to hear and record her demands. In that conversation, Schmitt told Jackson that Cosby had changed his mind and now wanted to come to an arrangement with her. Schmitt asked Jackson how much money she needed, saying her $40 million demand was unreasonable. Schmitt and Jackson negotiated and eventually arrived at the figure of $24 million. Schmitt told Jackson that she and Medina would have to come to New York to pick up a check. Jackson said that Medina was to receive 25 percent of the money and asked Schmitt to make out one check for $18 million and the other for $6 million. Schmitt made flight arrangements for Jackson, Medina, and Williams to travel from Los Angeles to New York that night, and asked Jackson to meet him in his office the next morning to execute a written agreement and pick up the checks.

That evening, Sabas drove Jackson, Medina, and Williams to the airport. Only Jackson and Medina flew to New York; Williams remained in Los Angeles, and Sabas allowed him to use Sabas's credit card to pay for tickets for Jackson's and Medina's return flight to California.

On the morning of January 18, 1997, Jackson and Medina met Schmitt at the offices of his law firm in Manhattan. Jackson and Medina reviewed a draft agreement, prepared by Schmitt under the direction of the FBI, which provided that, in consideration for $24 million, Jackson and Medina would "refrain from providing

any information whatsoever about Mr. Cosby to any third party," would "terminate any and all discussion with … *The Globe*," and would "not initiate any further discussions with *The Globe* or any other media outlet, with respect to Ms. Jackson's story that she is the daughter of Mr. Cosby." (Government Exhibit 37A.) When Jackson and Medina had signed, Schmitt left the room on the pretense of getting the checks, and FBI agents entered and arrested Jackson and Medina.

### D. *Evidence Seized in Postarrest Searches*

After the arrests, FBI agents searched Medina's hotel suite and safe deposit box in California. In the safe deposit box, they found cassette tapes with recordings of many of defendants' telephone calls. In the hotel suite, they found drafts of Jackson's letters to Schmitt and Lund, notes of research into Cosby's sponsors and publishers, and lists of "talking points" for a proposed conversation to be held with Lund, all in Jackson's handwriting. The agents also found a hand-written plan detailing the steps defendants intended to take to exploit *The Globe* source agreement and obtain money from Cosby or his sponsors, including such steps such as "Make Copy of Contract[,] White–Out Prices" and "Fax Letters to Jack Schmidt [*sic*] and Peter Lund." (Government Exhibit 69A3.) The agents also found a note that Jackson had drafted, apparently for Cosby, but never sent. It read in part: "Now, here is my deal. Either I go to the tabloids and/or CBS or we can settle now. That's what I am willing to do." (Tr. 1254.)

Thereafter, agents obtained additional tapes and documents that were in the possession of Sabas. They included the original *Globe* source agreement with the price whited out, letters faxed to Lund and Schmitt, and a tape of the January 16 conversation with Schmitt in which Jackson had demanded the payment of $40 million.

### E. *The Present Prosecution*

The present prosecution was commenced in February 1997. The superseding indictment alleged three counts against each defendant: (1) conspiracy to violate 18 U.S.C. § 875(d) and the Travel Act, 18 U.S.C. § 1952(a)(3), in violation of 18 U.S.C. § 371; (2) interstate transmission of threats to injure another person's reputation with the intent to extort money, in violation of 18 U.S.C. §§ 875(d) and 2; and (3) interstate travel in order to promote extortion, as prohibited by § 875(d) and the New York State extortion statute, N.Y. Penal Law § 155.05(2)(e)(v) (McKinney 1988), in violation of the Travel Act, 18 U.S.C. §§ 1952(a)(3) and 2. Following a jury trial, Jackson and Medina were convicted on all three counts. Sabas was convicted of conspiracy and violating the Travel Act but was acquitted on the § 875(d) extortion count.

In a posttrial motion defendants moved for dismissal of their convictions on the ground that § 875(d) and the New York State extortion statute, as interpreted in the district court's jury instructions, see Part II.A. below, are unconstitutionally overbroad or vague. In an opinion published at 986 F.Supp. 829 (S.D.N.Y.1997), the district court denied the motion, ruling that the statutes are not overbroad because they target only extortionate threats, not expressions of ideas or advocacy that typically implicate First Amendment protections, see 986 F.Supp. at 833–35, and because they proscribe only unequivocal and specific "true threats," see *id.* at 832–33. The court also found that the statutes in question are not impermissibly vague. *See id.* at 835–37. Judgments of conviction were entered, defendants were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

On appeal, Jackson and Medina contend principally that the district court gave an erroneous jury charge on the elements of

extortion as prohibited by § 875(d) because it omitted any instruction that, in order to convict, the jury must find that the threat to injure Cosby's reputation was "wrongful." Alternatively, they argue that if that section does not include an element of wrongfulness, it is unconstitutionally overbroad and vague. In addition, Medina contends that the district court improperly excluded from evidence portions of the tape recording of his January 17, 1997 conversation with Jackson's mother; and Sabas contends that the evidence was insufficient to support his conspiracy conviction and that he should have been tried separately from his codefendants. Finding merit in the challenge to the district court's instructions, we vacate and remand for a new trial.

A. *Extortion in Violation of 18 U.S.C. § 875(d)*

Section 875(d), the extortion statute under which Jackson and Medina were convicted, provides as follows:

> (d) Whoever, with intent to extort from any person ... any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another ... shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 875(d). This statute does not define the terms "extort" or "intent to extort." At trial, Jackson asked the court to instruct the jury that

> [t]o act with intent to "extort" means to act with the intent to obtain money or something of value from someone else, with that person's consent, but caused or induced by the wrongful use of fear,

and to explain that

> [t]he term "wrongful" in this regard means that the government must prove beyond a reasonable doubt, *first*, that the defendant had no lawful claim or right to the money or property he or she sought or attempted to obtain, and, *sec-*

*ond*, that the defendant knew that he or she had no lawful claim or right to the money or property he or she sought or attempted to obtain.

> If you have a reasonable doubt as to whether a defendant's object or purpose was to obtain money or other thing of value to which he or she was lawfully entitled, or believed he or she was lawfully entitled, then the defendant would not be acting in a "wrongful" manner and you must find him or her not guilty.

(Jackson's Requests To Charge Nos. 18, 19 (emphasis in original)).

The court informed the parties that it would not give these requested instructions, stating its view that "threatening someone's reputation for money or a thing of value is inherently wrongful." (Tr. 1481.) Consistent with that view, after instructing the jury that a § 875(d) offense has four elements, to wit, (1) an interstate communication, (2) containing a threat to reputation, (3) with intent to communicate such a threat, (4) with intent to extort, the court described the "intent to extort" element as follows, without mentioning any ingredient of wrongfulness:

> The fourth element, intent to extort. The final element that the government must prove beyond a reasonable doubt is that the defendant you are considering acted with the intent to extort money or a thing of value from Bill Cosby. You should use your common sense to determine whether the defendant you are considering had the requisite intent to extort. In this connection, *to extort means to obtain money or a thing of value from another by use of threats to reputation.*
>
> . . . .
>
> ... [I]t is not a defense that the alleged threats to another's reputation are based on true facts. In other words, it is irrelevant whether Bill Cosby in fact is the father of Autumn Jackson. Rather, you must determine whether the defendant you are considering communi-

cated a threat to injure Bill Cosby's reputation, and whether that defendant did so with intent to extort money from Bill Cosby.

In addition, if you find that the government has proved beyond a reasonable doubt a particular defendant threatened to injure Bill Cosby's reputation in order to obtain money from him, *it makes no difference whether the defendant was actually owed any money by Bill Cosby or thought he or she was.* That is because *the law does not permit someone to obtain money or a thing of value by threatening to injure another person's reputation.*

(Tr. 1778–80 (emphases added).)

Although in connection with the counts charging conspiracy and violations of the Travel Act the court instructed the jury that the government was required to proved that the defendant acted with the intent to engage in "unlawful" activity, *see* Part II.B. below, the court did not use the words "unlawful" or "wrongful" or any equivalent term in its instructions as to the scope of § 875(d).

 The government contends that § 875(d) contains no "wrongfulness" requirement, and that even if such a requirement is inferred, threats to injure another person's reputation are inherently wrongful. These arguments are not without some support. The subsection itself contains no explicit wrongfulness requirement, and it parallels a subsection that prohibits, with intent to extort, a "threat to kidnap" a person, 18 U.S.C. § 875(b), and a "threat to injure the person of another," *id.* Given the inherent wrongfulness of kidnaping and assault, the parallelism of subsection (b)'s prohibitions with § 875(d)'s prohibition against threats to injure reputation or property may support an inference that Congress considered threats to injure reputation to be inherently wrongful methods of obtaining money. Such an inference would be consistent with the established principle that, when a threat is made to injure the reputation of another, the truth

of the damaging allegations underlying the threat is not a defense to a charge of extortion under § 875(d). *See, e.g., United States v. Von der Linden,* 561 F.2d 1340, 1341 (9th Cir.1977) (per curiam), *cert. denied,* 435 U.S. 974, 98 S.Ct. 1621, 56 L.Ed.2d 68 (1978); *Keys v. United States,* 126 F.2d 181, 185 (8th Cir.), *cert. denied,* 316 U.S. 694, 62 S.Ct. 1296, 86 L.Ed. 1764 (1942); *cf. United States v. Pascucci,* 943 F.2d 1032, 1033–34, 1036–37 (9th Cir.1991) (§ 875(d) conviction upheld where defendant threatened to send genuine tape of extramarital sexual encounter to victim's employer).

Further, the government's suggested interpretation of § 875(d) finds support in *United States v. Pignatelli,* 125 F.2d 643, 646 (2d Cir.), *cert. denied,* 316 U.S. 680, 62 S.Ct. 1269, 86 L.Ed. 1754 (1942), in which we interpreted a section paralleling a predecessor of § 875(d), which prohibited a person, "with intent to extort from any person any money or other thing of value," from mailing a "communication . . . containing any threat to injure the property or reputation of the addressee or of another," 18 U.S.C. § 338a(c) (1940). Pignatelli, who had threatened by mail that unless he were paid $500,000 he would state in a book that a relative was falsely using the title of "Prince," contended on appeal that the trial court improperly excluded evidence showing that Pignatelli himself "had sole right to the title of Prince." 125 F.2d at 646. He argued that that evidence was relevant because it tended to show that his demands for money were made "in good faith and only in order to adjust pending disputes." *Id.* We rejected Pignatelli's claim, stating as follows:

> The book describing the victims as . . . swindlers . . . was a threat to injure their reputation, pure and simple. It is true that [Pignatelli] was free to publish the facts at the risk of liability in a libel suit, but he was not free to threaten to injure their reputations and to use the mails for that purpose in order to settle his claim. *Threats to damage another's*

*reputation are no proper means for determining a controversy.* It may be adjusted either by suit or by compromise but settlement must not be effected by using defamation as a club. The threat to publish the book for such a purpose was unlawful and it made no difference whether [Pignatelli] had the sole right to be called Prince or not. *Id.* (emphasis added).

Despite the categorical language of *Pignatelli,* and despite Congress's failure either to provide a definition of "extort" for purposes of § 875(d) or to include in § 875(d) the word "wrongful," we are troubled that § 875(d) should be interpreted to contain no element of wrongfulness, for plainly not all threats to engage in speech that will have the effect of damaging another person's reputation, even if a forbearance from speaking is conditioned on the payment of money, are wrongful. For example, the purchaser of an allegedly defective product may threaten to complain to a consumer protection agency or to bring suit in a public forum if the manufacturer does not make good on its warranty. Or she may threaten to enlist the aid of a television "on-the-side-of-the-consumer" program. Or a private club may threaten to post a list of the club members who have not yet paid their dues. We doubt that Congress intended § 875(d) to criminalize acts such as these.

Further, we cannot view the absence of an extortion definition in § 875, or the absence of the word "wrongful," as particularly meaningful, for an overview of the Criminal Code reveals that, in enacting provisions dealing with extortion, Congress has simply been inconsistent as to the inclusion of such a word and as to the inclusion of an extortion definition. The inconsistency in format does not appear to bespeak different legislative intentions as to the meaning of extortion, for where a definition has been included, the concept of wrongfulness is made explicit; and in most sections where there is no definition and no use of adjectives such as "wrongful" or

"unlawful," such a concept seems nonetheless implicit. For example, in Chapter 42 of the Code, which encompasses 18 U.S.C. §§ 891–896 and is entitled "Extortionate Credit Transactions," the use of any "extortionate means" to collect an extension of credit is forbidden, *see, e.g., id.* § 894(a), and "extortionate means" is defined: It encompasses "any means which involves the use, or an express or implicit threat of use, of *violence or other criminal means* to cause harm to the person, reputation, or property of any person," *id.* § 891(7) (emphasis added). Section 875, on the other hand, is in Chapter 41 of the Code, which encompasses 18 U.S.C. §§ 871–880 and is entitled "Extortion and Threats." In Chapter 41, the words "extort," "extortion," and "extortionate" are used in several sections, but all are undefined. Nonetheless, most of the acts prohibited in those sections must have been viewed as inherently wrongful. For example, §§ 875(a), (b), and (c) and the first three paragraphs of § 876 deal with extortionate threats to kidnap or to injure a person, conduct that plainly is inherently wrongful. In § 872, the conduct that is prohibited is simply the commission or attempted commission, by, *inter alios,* a federal employee, of "an act of extortion." 18 U.S.C. § 872. Since § 872 contains no pertinent qualifying language, it seems plain that Congress views "extortion" as wrongful.

A similar juxtaposition of the presence and absence of definitions of extortion can be seen in the Hobbs Act, 18 U.S.C. § 1951, and the Travel Act, 18 U.S.C. § 1952. The Hobbs Act prohibits, *inter alia,* obstructing, delaying, or affecting commerce "by robbery or extortion," *id.* § 1951(a), and it defines extortion as follows:

The term "extortion" means the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear, or under color of official right,

*id.* § 1951(b)(2) (emphasis added). The Travel Act refers to "extortion" without

defining it. That Act has nonetheless been interpreted as using the term in its "generic" sense, a sense that inherently signifies wrongfulness. Thus, in determining whether the term "extortion" as used in § 1952 was meant to encompass acts that at common law were classified as blackmail but not as extortion (because not committed by a public official), the Supreme Court accepted the

> Government['s] .... suggest[ion] that Congress intended that extortion should refer to those acts prohibited by state law which would be *generically* classified as extortionate, i.e., obtaining something of value from another with his consent induced by the *wrongful* use of force, fear, or threats.

*United States v. Nardello*, 393 U.S. 286, 290, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969) (emphasis added).

In sum, in sections of the Criminal Code other than § 875(d), the words "extort," "extortionate," and "extortion" either are defined to have a wrongfulness component or implicitly contain such a component. If Congress had meant the word "extort" in § 875(d) to have a different connotation, we doubt that it would have chosen to convey that intention by means of silence. Given its silence and given the plain connotation of extortion in other sections, we decline to infer that "extort" as used in § 875(d) lacks a component of wrongfulness.

The legislative history of § 875(d) also supports our view that the phrase "intent to extort" was meant to reach only demands that are wrongful, for the predecessor to that section was enacted contemporaneously with the Anti–Racketeering Act of 1934, 18 U.S.C. § 420a–420e (1934) ("1934 Act"), which is the predecessor to the Hobbs Act, 18 U.S.C. § 1951. The Hobbs Act's definition of extortion ("the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right") dates back to the 1934 Act, which provided penalties for any person who

> (b) Obtains property of another, with his consent, induced by wrongful use of force or fear, or under color of official right,

or who

> (c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate subsection[ ] . . . (b).

18 U.S.C. § 420a(b) and (c) (1934). Although the structure of the 1934 Act differs from that of Hobbs Act, the substance of their prohibitions is the same. *Accord Bianchi v. United States*, 219 F.2d 182, 188–89 (8th Cir.) (prohibition of extortion in the Hobbs Act is substantially the same as in the 1934 Act, both of which contain wrongfulness element), *cert. denied*, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955). And although the word "extortion" itself is not used in the 1934 Act, it is quite clear that Congress meant the statutory language to describe what it viewed as the essence of extortion, for the report of the Senate Judiciary Committee discussing the bill that would become the 1934 Act stated that the bill was aimed at "persons who commit acts of violence, intimidation and extortion." S.Rep. No. 73–532, at 1 (1934); *see id.* ("The proposed statute . . . makes it a felony to do any act 'affecting' or 'burdening' . . . commerce if accompanied by extortion. . . .").

The 1945 debates on the bill that was eventually to become the Hobbs Act, *see* 91 Cong. Rec. 11,839–48, 11,899–922 (1945), showed both that the legislators believed that the 1934 Congress viewed extortion as having an element of wrongfulness, and that the Hobbs Act Congress—which retained the substance of the 1934 Act's prohibition—held the same view. *See id.* at 11,901–02, 11,906, 11,908, 11,920. The discussion leading to the express use of the word "extortion" in the Hobbs Act, and of the definition of that term, centered on the generally accepted

meaning of the term, which traditionally included a component of wrongfulness. The Hobbs Act proponents pointed out that the 1934 Act was fashioned in no small measure after the then-current definition of extortion used in the New York Penal Code. *See, e.g.,* 91 Cong. Rec. 11,843, 11,900, 11,906; *see also United States v. Zappola,* 677 F.2d 264, 268 (2d Cir.), *cert. denied,* 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982); *United States v. Nedley,* 255 F.2d 350, 355 (3rd Cir.1958). That definition expressly included a "wrongfulness" element, *see* N.Y. Penal Law § 850 (Consol.1930) (extortion is the "obtaining of property from another ... with [his] consent, induced by a *wrongful* use of force or fear, or under color of official right" (emphasis added)), and the Hobbs Act proponents viewed that definition as representative of the extortion laws of every state, *see* 91 Cong. Rec. at 11,906. Thus, the definition of extortion included in the Hobbs Act reflected what its proponents believed to be the generally accepted definition. *See id.* at 11,900, 11,906, 11,- 910, 11,914; *see generally Black's Law Dictionary* 696 (4th ed.1957) ("extort": "To gain by wrongful methods, to obtain in an unlawful manner, to compel payments by means of threats of injury to person, property, or reputation .... to exact something unlawfully by threats or putting in fear."). Accordingly, Representative Hobbs stated that the terms extortion and robbery "have been construed a thousand times by the courts. Everybody knows what they mean." 91 Cong. Rec. 11,912.

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

*Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In enacting the Hobbs Act, Congress made express what we would ordinarily presume with respect to the meaning of extortion.

At the same time that Congress was fashioning the 1934 Act to prohibit extortion it was considering the bill that would become 18 U.S.C. § 408d (1934), the predecessor of § 875. In terms virtually identical to those of § 875(d), the first numbered clause of § 408d prohibited

> with intent to extort from any person ... any money or thing of value, [the] transmi[ssion] in interstate commerce by any means whatsoever, [of] any threat (1) to injure the person, property, or reputation of any person.

18 U.S.C. § 408d (1934). Although the passage of § 408d preceded the passage of the 1934 Act by a month, it is plain that the two statutes were considered by Congress contemporaneously. The Senate Report on the bill that would become the 1934 Act, emphasizing that that bill targeted "extortion," S.Rep. No. 73–532, at 1 (1934), was issued in March 1934; the 1934 Act was passed in June, prohibiting what Congress viewed as extortionate conduct; and during the period between the issuance of the Report and the passage of the 1934 Act, Congress passed § 408d, prohibiting threats to injure reputation "with intent to extort." The simultaneous consideration of the two enactments focusing on extortion gives rise to a strong inference that Congress intended to give the same meaning to extortion in both statutes.

Under the Hobbs Act definition of extortion, which includes obtaining property from another through a wrongful threat of force or fear, the use of a threat can be wrongful because it causes the victim to fear a harm that is itself wrongful, such as physical injury, or because the means is wrongful, such as violence. *See, e.g., United States v. Zappola,* 677 F.2d at 269. However, the Hobbs Act may also be violated by a threat that causes the victim to

fear only an economic loss. *See, e.g., United States v. Margiotta,* 688 F.2d 108, 134 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Yet as we discussed in *United States v. Clemente,* 640 F.2d 1069, 1077 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981), a threat to cause economic loss is not inherently wrongful; it becomes wrongful only when it is used to obtain property to which the threatener is not entitled.

In *Clemente,* we considered challenges to Hobbs Act convictions on the ground that the trial court's instructions permitted the jury to "convict[ Clemente] solely upon finding that he used fear of economic loss to obtain money," and that as a matter of law "the use of fear of economic loss is not inherently wrongful." 640 F.2d at 1077. We rejected the challenge because Clemente's factual premise was erroneous. The trial court had in fact informed the jury, *inter alia,* that "extortion" means obtaining property from another, with his consent, induced by the "wrongful" use of actual or threatened force or fear, *id.* at 1076 (internal quotation marks omitted), and had instructed that "[w]rongful" meant that the defendant in question had instilled in his victim the fear of economic loss of property to which the defendant "had no lawful right," *id.* at 1077 (internal quotation marks omitted). In upholding the convictions, we stated as follows:

> We are satisfied that the charge correctly instructed the jury on the wrongfulness element of the crime of extortion. The thrust of the district court's charge when read as a whole, *see Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 ... (1973), was that the use of fear of economic loss to obtain property to which one is not entitled is wrongful. *It is obvious that the use of fear of financial injury is not inherently wrongful. And precisely because of this fact, the "objective" of the party employing fear of economic loss will have a bearing on the lawfulness of*

*its use.* In this regard, Judge Sand instructed the jury that the wrongfulness element of the crime would be satisfied upon finding that fear of economic loss was employed by the defendants to obtain money to which they were not lawfully entitled.

*Id.* at 1077 (emphasis added).

We are persuaded that a similar interpretation of § 875(d) is appropriate. Given Congress's contemporaneous consideration of the predecessors of § 875(d) and the Hobbs Act, both of which focused on extortion, we infer that Congress's concept of extortion was the same with respect to both statutes. The congressional discussions make clear that Congress meant to adopt the traditional concept of extortion, which includes an element of wrongfulness. And since, like threats of economic harm, not every threat to make a disclosure that would harm another person's reputation is wrongful, we adopt an interpretation of § 875(d) similar to *Clemente*'s interpretation of the Hobbs Act. We conclude that not all threats to reputation are within the scope of § 875(d), that the objective of the party employing fear of economic loss or damage to reputation will have a bearing on the lawfulness of its use, and that it is material whether the defendant had a claim of right to the money demanded.

We do, however, view as inherently wrongful the type of threat to reputation that has no nexus to a claim of right. There are significant differences between, on the one hand, threatened disclosures of such matters as consumer complaints and nonpayment of dues, as to which the threatener has a plausible claim of right, and, on the other hand, threatened disclosures of such matters as sexual indiscretions that have no nexus with any plausible claim of right. In the former category of threats, the disclosures themselves—not only the threats—have the potential for causing payment of the money demanded; in the latter category, it is only the threat that has that potential, and actual disclosure would frustrate the prospect of pay-

ment. Thus, if the club posts a list of members with unpaid dues and its list is accurate, the dues generally will be paid; if the consumer lodges her complaint and is right, she is likely to receive her refund; and both matters are thereby concluded. In contrast, if a threatener having no claim of right discloses the victim's secret, regardless of whether her information is correct she normally gets nothing from the target of her threats. And if the victim makes the demanded payment, thereby avoiding disclosure, there is nothing to prevent the threatener from repeatedly demanding money even after prior demands have been fully met.

Where there is no plausible claim of right and the only leverage to force the payment of money resides in the threat, where actual disclosure would be counterproductive, and where compliance with the threatener's demands provides no assurance against additional demands based on renewed threats of disclosure, we regard a threat to reputation as inherently wrongful. We conclude that where a threat of harm to a person's reputation seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, or where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful and its transmission in interstate commerce is prohibited by § 875(d).

■ Within this framework, we conclude that the district court's instruction to the jury on the meaning of "extort" as that term is used in § 875(d) was erroneous. The court instructed simply that "to extort means to obtain money or a thing of value from another by use of threats to reputation." The court gave no other explanation of the term "extort" and did not limit the scope of that term to the obtaining of property to which the defendant had no actual, or reasonable belief of, entitlement. Rather, the court added that "it makes no difference whether the defendant was actually owed any money by" the victim of the threats. While it would have been

correct to instruct that it makes no difference whether the defendant was actually owed money by the threat victim if the threat has no nexus to the defendant's claim, the instruction as given lacked this essential component. Issues of whether a defendant has a plausible claim of right and whether there is a nexus between the threat and the defendant's claim are questions of fact for the factfinder, and we conclude that the jury was not properly instructed as to the elements of a § 875(d) offense.

■ The evidence at trial was plainly sufficient to support verdicts of guilty had the jury been properly instructed. Even if Jackson were Cosby's child, a rational jury could find that her demand, given her age (22) and the amount ($40 million), did not reflect a plausible claim for support. The evidence supported an inference that Jackson had no right to demand money from Cosby pursuant to a contract or promise and no right to insist that she be included in his will. The jury thus could have found that her threat to disclose was the only leverage she had to extract money from him; that if she sold her story to *The Globe*, she would lose that leverage; and that if Cosby had capitulated and paid her in order to prevent disclosure, there was no logical guarantee that there would not be a similar threat and demand in the future. Thus, had the jury been instructed that the "with intent to extort" element meant that defendants could be found guilty of violating § 875(d) only if Jackson's threat to disclose was issued in connection with a claim for money to which she was not entitled or which had no nexus to a plausible claim of right, the jury could permissibly have returned verdicts of guilty on that count.

We conclude, however, that the court's failure to inform the jury of the proper scope of the intent-to-extort element of § 875(d) erroneously allowed the jury to find defendants guilty of violating that section on the premise that any and every threat to reputation in order to obtain

money is inherently wrongful. Accordingly, Jackson and Medina are entitled to a new trial on the § 875(d) count.

B. *The Conspiracy and Travel Act Counts*

We conclude that defendants' convictions of conspiracy and Travel Act violations must also be set aside. In its instructions on the conspiracy count, the district court made clear that a defendant could not be found guilty on that count unless he or she was aware of the unlawful nature of the agreement. Thus, it informed the jury, *inter alia*, that in order to convict a given defendant on that count, it must find that that defendant entered into the alleged conspiracy with criminal intent, *i.e.*, with "aware[ness] of the generally unlawful nature of his or her acts" (Tr. 1769), *i.e.*, that the defendants acted "with an understanding of the unlawful character of the conspiracy, intentionally engaged, advised, or assisted in it for the purpose of furthering one or both of its unlawful objects" (Tr. 1771). However, in elaborating on the allegedly unlawful acts and objects of the conspiracy, the court stated:

The indictment charges two distinct unlawful objects or goals. The first charges that it was an object of the conspiracy that the defendants, with the intent to extort money and things of value from Bill Cosby, would and did transmit in interstate commerce communications containing threats to injure the reputation of Bill Cosby, in violation of Section 875(d) and, as I have told you, in addition the indictment alleges a second object of this conspiracy, to violate Section 1952(a)(3) of Title 18 of the United States Code, which makes it unlawful to cross state lines or use interstate facilities to facilitate extortion.

. . . [I]t is not necessary for the government to prove the success of the conspiracy. It is also not necessary for you to find that the conspiracy embodied both of these unlawful objectives.

It is sufficient if you find beyond a reasonable doubt the conspirators agreed, implicitly or impliedly [*sic*], on either of these two objectives. When a conspiracy has more than one objective, the government need prove only that the defendant you are considering agreed to accomplish at least one of the criminal objectives.

(Tr. 1767–68.) Thus, the instruction on conspiracy incorporated the error in the court's instruction on § 875(d), thereby erroneously allowing the jury to find defendants guilty of a conspiracy to engage in conduct that, under the court's definition, could have been lawful. Defendants are entitled to a new trial on the conspiracy count with the jury properly instructed as to the nature of the conduct prohibited by § 875(d).

The court's instructions on the Travel Act count likewise incorporated the erroneous instruction on the § 875(d) count. As to the objectives of the interstate travel, the court stated as follows:

The indictment alleges that the defendant traveled or caused someone else to travel interstate and used or caused someone else to use interstate facilities to facilitate two forms of unlawful activity, extortion in violation of 875(d), and extortion in violation of Section 155 of the New York Penal Law. The government must prove to you beyond a reasonable doubt that the activities the defendant intended to facilitate were in fact unlawful under either federal law or New York State law.

It is sufficient if you find beyond a reasonable doubt that the conduct was unlawful under either of these statutes. Of course, to conclude that the government has met its burden of proof in this case, you must unanimously agree on whichever statute you may find that the conduct violated.

. . . .

I have already instructed you on elements of extortion under the federal law under 875(d) in connection with my

charge to you on Count 2. Those instructions apply here as well.

(Tr. 1785–86.) Accordingly, defendants are entitled to a new trial on the Travel Act count as well.

### C. Other Contentions

Medina and Sabas advance additional contentions that we discuss briefly in light of our order for a remand.

#### 1. Admission of the Medina–Thompson Conversation Excerpt

█ Medina contends that the district court erred in refusing to allow him to introduce parts of the tape of his January 16, 1997 conversation with Thompson. The conversation was roughly 42 minutes long; the government offered in evidence only a 90–second portion of the tape near the beginning of the conversation, in which Thompson warned that the scheme in which Jackson was engaged constituted the federal crime of extortion. The excerpt was admitted as evidence of Medina's awareness of the unlawfulness of the extortion scheme. The court denied Medina's request that the remainder of the tape be admitted pursuant to the "rule of completeness." We see no error in that denial.

Rule 106 of the Federal Rules of Evidence provides that

> [w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed.R.Evid. 106. Under this principle, an "omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Castro,* 813 F.2d 571, 575–76 (2d Cir.), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); *see, e.g., Beech*

*Aircraft Corp. v. Rainey,* 488 U.S. 153, 172–73, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988); *Phoenix Associates III v. Stone,* 60 F.3d 95, 102 (2d Cir.1995). The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages. *See United States v. Marin,* 669 F.2d 73, 84 (2d Cir.1982). The trial court's application of the rule of completeness is reviewed only for abuse of discretion. *See, e.g., United States v. Castro,* 813 F.2d at 576.

Medina argues that a jury hearing the tone and substance of Thompson's statements in later portions of the conversation would perceive Thompson to be exaggerating, overly emotional, or "out of control," and would conclude that Medina had reason to discount her warning that Jackson's conduct was unlawful. The trial court, after listening to the tape, saw little probative value in the parts of the tape proffered by Medina, noting, *inter alia,* that the substance of Thompson's remarks in the remainder of the conversation was neither incredible nor bizarre, and that Thompson's "tone was pretty calm and reasoned." (Tr. 1342–43.) The court also noted that the portions of the tape proffered by Medina consisted largely of Medina's own self-serving statements, which, as offered by him, are inadmissible hearsay. We see no abuse of discretion in the exclusion of the tape.

#### 2. Sabas's Sufficiency Challenges

█ Focusing principally on the conspiracy count, Sabas contends that he is entitled to reversal on the ground that the evidence was insufficient to support his conviction. If this contention had merit, Sabas would be entitled to dismissal of the conspiracy count, rather than being retried on that count. *See, e.g., Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). We conclude that his contention is without merit.

In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden, for the reviewing court must view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility. *See, e.g., United States v. Allah,* 130 F.3d 33, 45 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2347, 141 L.Ed.2d 718 (1998); *United States v. Giraldo,* 80 F.3d 667, 673 (2d Cir.), *cert. denied,* 519 U.S. 847, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996). We must affirm the conviction so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See, e.g., Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Amato,* 15 F.3d 230, 235 (2d Cir.1994).

In order to prove a conspiracy, the government must present evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme and knowingly joined and participated in it. *See, e.g., United States v. Giraldo,* 80 F.3d at 673; *United States v. Sanchez Solis,* 882 F.2d 693, 696 (2d Cir.1989). Mere presence at the scene or association with conspirators does not constitute participation in the conspiracy, even if the defendant has knowledge of the conspiracy. *See, e.g., United States v. Jones,* 30 F.3d 276, 282 (2d Cir.), *cert. denied,* 513 U.S. 1028, 115 S.Ct. 602, 130 L.Ed.2d 513 (1994); *United States v. Scarpa,* 913 F.2d 993, 1005 (2d Cir.1990); *United States v. Torres,* 901 F.2d 205, 220 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). However, "[o]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *United States v. Amato,* 15 F.3d at 235 (internal quotation marks omitted); *see, e.g., United States v. Rivera,* 971 F.2d 876, 891 (2d Cir.1992); *United States v. Scarpa,* 913 F.2d at 1005. The elements of conspiracy, like the elements of substantive offenses, may be established through circumstantial evidence. *See, e.g., United States v. Amato,* 15 F.3d at 235; *United States v. Rivera,* 971 F.2d at 890.

The evidence in the present case was sufficient under these standards. First, there was ample evidence that Sabas was present for many of the key conspiratorial conversations, which could have left no doubt in his mind as to the nature of the discussions. For example, Macaraeg testified that Sabas was present at the discussions during the week of January 6, in which Jackson and Medina discussed ways to threaten Cosby's reputation and pressure sponsors in order to force Cosby to give Jackson money; Sabas was present when Medina and Jackson were formulating a draft press release designed to increase that pressure; Sabas was present when Medina announced that Cosby would "have to pay a lot of money" if he did not want Jackson's story to come out; and Sabas was present on January 16 when Jackson spoke with Schmitt by telephone and stated that she would sell her story to a tabloid unless she received $40 million.

Second, there was evidence that Sabas acted to further the objectives of the conspiracy. After the January 17 negotiations between Jackson and Schmitt culminated in an agreed figure of $24 million, which Jackson and Medina were to collect in New York, Sabas drove Jackson and Medina to the airport. At Medina's instruction, Sabas provided Williams with a place to stay that night. In addition, Sabas allowed the use of his credit card for the purchase of return tickets for Jackson and Medina.

Finally, while Jackson and Medina were in New York, Sabas had possession of several documents and tapes that were integral to the scheme, including the source agreement with *The Globe,* the letters faxed to Lund and Schmitt in which Jackson threatened to take her story to the media, and a tape of the conversation in which Jackson demanded $40 million. Sabas concealed some of these materials in

his parents' house rather than his own. When asked for these items by FBI agents after Jackson and Medina were arrested, he sought to conceal them. He first responded that they were at the house of a friend, whom he refused to identify; he told the agents he would lead them to the friend's house, but he then engaged in evasive driving, and the agents lost track of him. The agents were unable to find Sabas at his home again for two days. When they did find him and served him with a subpoena, he gave them only some of the materials they requested, stating that he was giving them everything. It was only after a third visit by the agents, along with a threatened charge of obstruction of justice, that Sabas took the agents to his parents' home and produced all of the remaining evidence.

In sum, the evidence as to Sabas's awareness and involvement was sufficient to permit a rational juror to find beyond a reasonable doubt that Sabas knew of the conspiracy, intended to join it, and did participate in it.

 To the extent that Sabas also contends that the evidence was insufficient to support his conviction of interstate travel to promote extortion, that contention too lacks merit. The evidence that Sabas, with knowledge of the scheme, drove Jackson and Medina to the airport for their trip from California to New York and provided them with tickets for their intended return, was ample to permit his conviction of a Travel Act violation on an aiding and abetting theory. *See, e.g., United States v. Gordon,* 987 F.2d 902, 907 (2d Cir.1993) ("[a] defendant may be found guilty of a substantive crime on an aiding and abetting theory if he joined the criminal venture, shared in it, and contributed to its success").

3. *Severance*

 Sabas also contends that he should have been tried separately from Jackson and Medina because the evidence was so much stronger against them than against him and because his defense was "diametrically opposite from [theirs]." (Sabas brief on appeal at 9). We conclude that his motions for severance were properly denied.

 In the federal system, multiple defendants may be charged in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions," Fed.R.Crim.P. 8(b), and there is a clear preference that defendants who are indicted together be tried jointly, *see, e.g., Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *United States v. Miller,* 116 F.3d 641, 679 (2d Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998). If defendants have been properly joined under Rule 8(b), a severance motion should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. at 539, 113 S.Ct. 933; *see, e.g., United States v. Aulicino,* 44 F.3d 1102, 1116 (2d Cir.1995).

 The denial of a motion for severance will not be overturned absent an abuse of discretion of the district court, *see, e.g., United States v. Rosa,* 11 F.3d 315, 341 (2d Cir.1993), *cert. denied,* 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994); *United States v. Benitez,* 920 F.2d 1080, 1085 (2d Cir.1990), resulting in prejudice so severe that the defendant's conviction constituted "a miscarriage of justice," *United States v. Aulicino,* 44 F.3d at 1117; *United States v. Rosa,* 11 F.3d at 341. A jury's acquittal of a defendant on one or more counts is persuasive evidence that joinder did not result in prejudice. *See, e.g., United States v. Aulicino,* 44 F.3d at 1117.

We see no abuse of discretion or unfair prejudice in requiring that Sabas, Jackson, and Medina be tried together. First, we see no inconsistency in the defendants'

respective defenses. Sabas's defense was that he lacked knowledge of any conspiracy; the defense of Jackson and Medina was that they lacked the necessary criminal intent because they believed they had certain legal rights to money from Cosby. The two stances are not necessarily inconsistent. Second, since Sabas is charged with participating in a conspiracy with Jackson and Medina, nearly all of the evidence admitted at a trial of Jackson and Medina would also be admissible in a separate trial of Sabas. Third, as discussed above, there is ample evidence to support Sabas's convictions of conspiracy to commit extortion and of aiding and abetting violation of the Travel Act. Finally, we have little doubt that a jury is capable of discerningly assessing the weight of the evidence in order to differentiate among these three defendants. The original jury did precisely that, finding Jackson and Medina guilty on the § 875(d) count while acquitting Sabas on that count.

Accordingly, on remand, all three defendants may be retried together.

## CONCLUSION

For the foregoing reasons, we vacate the convictions and remand for a new trial.